744 A.2d 679 (2000)
328 N.J. Super. 41
Joyce A. POLISENO, Individually, and as Administratrix Ad Prosequendum of the Estate of Michael Kuhlbars, Deceased, and as General Administratrix of the Estate of Michael Kuhlbars, Deceased, Plaintiff-Appellant/Cross-Respondent,
v.
GENERAL MOTORS CORPORATION, Chevrolet Corvette, a Division of General Motors Corporation, Defendant-Respondent/Cross-Appellant, and
A. Better Deal, Inc., Defendant.[1]
Superior Court of New Jersey, Appellate Division.
Argued October 4, 1999.
Decided February 8, 2000.
*681 Robert A. Vort, Tanafly, for plaintiff-appellant/cross-respondent (James F. Carney, of counsel and on the brief, Roseland; Mr. Vort, on the brief).
James N. Tracy, Point Pleasant, for defendant-respondent/cross-appellant (Tansey, Fanning, Haggerty, Kelly, Convery & Tracy, attorneys; Thomas F. Tansey, of counsel, Woodbridge; Mr. Tracy, of counsel and on the brief).
Before Judges HAVEY, KEEFE and LINTNER.
*680 The opinion of the court was delivered by KEEFE, J.A.D.
Plaintiff, Joyce A. Poliseno, individually and as administratrix ad prosequendum of the estate of her deceased husband, Michael Kuhlbars, brought this wrongful death action against defendant General Motors Corporation, claiming that the driver's side door of the 1985 Corvette driven by Kuhlbars was defectively manufactured and that such defect resulted in the vehicle not being "crashworthy."[2] She claimed that defects in the door welds caused enhanced injuries to her husband, which resulted in his death. Plaintiff also brought suit for emotional distress injuries *682 to herself resulting from her observation of Kuhlbars' injuries and death.
The jury found that the car contained defective driver's-side door beam welds and caused enhanced injuries. It found, however, that 80 percent of Kuhlbars' injuries were caused by the accident and only 20 percent were caused by the defective welds. The jury awarded $2.2 million in damages for Kuhlbars' wrongful death and $100,000 for plaintiff's claim of emotional distress. The trial judge molded the verdicts in accord with the jury's finding as to causation. Plaintiff appeals from the denial of her motion for a judgment notwithstanding the verdict, or in the alternative, for a new trial. Defendant cross-appeals from the denial of its motions for a judgment notwithstanding the verdict or for a new trial.
The appeal and cross-appeal require that we determine whether: (1) the plaintiff or defendant has the burden of proof with respect to the apportionment of crashworthy damages; (2) death is an indivisible injury incapable of apportionment; and (3) if so, whether the instructions to the jury on the issue of concurrent causation were adequate. We conclude that the judge erred by placing the burden of apportionment on the plaintiff; death is capable of apportionment as to causation; there was sufficient evidence in the record from which a jury could apportion causation; the jury was not instructed properly on concurrent causation; and the insufficiency of the instructions, coupled with the erroneous allocation of burden of proof, require a new trial on the issues of causation and apportionment of damages.
The accident occurred on May 15, 1993, in Berlin, Germany. At the time, Kuhlbars was employed as a civilian accountant with the United States Armed Forces and plaintiff was employed as an attorney with the Department of Defense. Kuhlbars and plaintiff had been dining with two friends, Jean and Evelyn Boyd, that evening. After dinner, Kuhlbars, who was driving a 1985 Corvette purchased only a few months before the accident, was following a car driven by Jean Boyd through a residential area. At some point, Kuhlbars accelerated and passed the Boyd vehicle. The Corvette hydroplaned on the wet roadway, slid sideways off the road, jumped a curb on the right side of the roadway, and became wedged between a retaining wall on the right and a tree on the left.
As a result of the collision with the tree, the car was damaged along the left side, beginning at the left front wheel well and continuing to approximately the center of the driver's door, where the door had pocketed and the tree had protruded twenty inches into the driver's-side compartment. The windshield had also displaced from the left to the right, the steering wheel had been moved toward the center of the car, and the glass in the windshield and driver's-side window had shattered.
Plaintiff received only a minor laceration. Kuhlbars, however, was unconscious and was staring blankly ahead with his eyes wide open and blood coming out of his ears. Kuhlbars was removed from the car and taken to the hospital where he remained unconscious until he died on June 3, 1993. Kuhlbars had suffered multiple skull fractures, an epidural hemorrhage, a diffuse anoxal brain injury, a contused left lung, a tearing laceration of the left ear lobe, damage to the left optic nerve, and a broken right wrist.[3] At trial, the parties stipulated that Kuhlbars had died of the sequelae of the head injury he had received in the accident.
It was undisputed that the welds which had connected the driver's-side door beam to the internal structural components of the door had separated during the accident, *683 and that this separation was not the cause of the accident.
James Pugh, plaintiff's expert in the fields of accident reconstruction, metallurgy, welding, and biomedical engineering, testified that the Corvette's door beam had separated during the accident because it was defectively welded and thus was not strong enough to bear the load of this low-speed accident. He explained that the driver's-side door contained a high strength, low alloy steel beam whose purpose was to strengthen or stiffen the door of the car, thereby resisting penetration and protecting the driver. The beam was joined at its forward end to the hinge on the door frame by seven spot welds. A "spot weld" is a weld made by passing an electric current through two pieces of compressed metal, causing the metals to melt and fuse. According to Pugh, the welds deviated from several of defendant's internal standards. While defendant offered evidence to rebut that contention, defendant does not challenge the jury's finding of defect on appeal. Therefore, we need not discuss the evidence concerning the manufacturing defect in more detail.
The focus of this appeal is, rather, on the experts' divergent views concerning the force of impact, the sequence of events after impact, including the damage to the vehicle, and Kuhlbars' movement within the vehicle.
With regard to the accident dynamics, Pugh determined that the Corvette had been proceeding at approximately seventeen miles per hour with a principal direction of force of twenty degrees when the left front wheel struck a glancing blow to the tree. During the collision, the car experienced a change in velocity or "delta-V" of between ten and fifteen miles per hour. The car continued forward scraping the tree, until the tree reached the left door where the beam failed because of the defective welds, causing the tree to pocket or protrude into the driver's-side space, hitting Kuhlbars. Pugh admitted that there was a tendency for a driver to "move forward" when pocketing occurs, but explained that in this particular incident "most of the motion," and therefore the cause of Kuhlbars' injuries, occurred as a result of the tree moving into Kuhlbars.
Pugh described the accident as "moderate" and not severe, given Kuhlbars' speed and the fact that the car had impacted the tree with a glancing blow, rather than a direct hit. Thus, he maintained that if the weld had been properly joined, the beam would have remained intact during the accident and would have been able to bear the load of the glancing blow. Moreover, had the beam stayed intact, the tree would only have intruded into the driver's-side compartment approximately five inches, instead of twenty, and as a result, Kuhlbars would have sustained only a minor laceration as opposed to a fatal head injury.
On the same subject, Douglas Lane, defendant's senior staff analysis engineer and accident reconstruction expert, testified that the Corvette's left front wheel had hit the tree at a fifteen to twenty-five degree "side slip" angle, while traveling at a speed of between twenty-five and twenty-nine miles per hour. Lane concluded that the car collided with the tree at approximately ten miles per hour, experienced a "delta-V" of between twenty and twenty-three miles per hour and a principal direction of force of between forty and fifty-five degrees. He described the impact as "very significant," and concluded that the door beam had separated late in the accident sequence near the time of maximum engagement with the tree, as evidenced by the U-shaped deformation pattern of the door beam. In his opinion, if the welds had separated during the early part of the impact with the tree, as suggested by Pugh, the door beam would have been straight, not U-shaped.
George Mackay, defendant's expert in biomechanics and damage analysis, analyzed the damage to the Corvette and determined that there was "progressive[ ] damage of the left front wheel, the side *684 panel, the base of the A-post and then the door." He concluded that prior to the separation of the welds, the driver's-side window shattered, Kuhlbars's head then moved out of the shattered driver's-side window at a forty-five-degree angle, and hit the tree at approximately twenty-five miles per hour. He explained that generally an occupant of a vehicle moves along the angle of the principal direction of force. Thus, as a result of the force caused by sliding contact with the tree, Kuhlbars' head had begun to move toward the left and forward "relatively early during the crash sequence." He explained that
because of the sequential loading along the side of the car from the left front wheel, the side panel into the base of the A-pillar, those forces are of sufficient duration and magnitude that the driver is beginning to move laterally and forward relative to the inside of the vehicle and thus his head progresses forward and at an angle through the side window which will be fractured when you get some significant displacement of the base of the A-pillar.... So, that his head will pass through an empty space and contact the tree well before the full development of the deformation of the door.
He concluded that Kuhlbars' head injury was caused by the direct contact with the tree and not by the tree's intrusion into the driver's compartment. He explained that
the nature of his injuries is consistent with [sic] significant blow on the left frontal aspect of the head, something of an oblique blow with the soft tissue injury to the ear. The fact that he's got this defuse injury is an indicator of a rotation of the head as a result of the impact and that's implying that the load is not directed right through the center of gravity of the head, it's causing a rotation as a result of the impact. This [ ] has been demonstrated as one of the mechanisms for this defuse brain injury. So, in terms of the specific mechanisms of the head injuries, I think he's having a blow from the tree directly along the side of his head on the left side.
He concluded that Kuhlbars' head injuries occurred before the welds separated and "well before the full development of the intrusion" or the "crush of the door," and thus the separation of the welds was not the cause of the injuries. According to Mackay, the difference between the damage that would have occurred had the welds remained intact as opposed to separating "would be negligible." Therefore, Mackay maintained that Kuhlbars would have sustained fatal head injuries in the accident even if the beam had remained intact.
The jury returned a verdict in response to special interrogatories as follows:
1. Did the Corvette at the time it left the control of General Motors contain defective driver's side door beam welds that made the car not reasonably safe for its intended use?
Yes7 No2
2. Were the defective door beam welds a proximate cause of enhanced injuries to Michael Kuhlbars, in other words, injuries that are greater than he would have sustained from the accident alone?
Yes7 No2
3. In terms of percentages, what percent of Michael Kuhlbars' injuries were proximately caused by the accident alone and what percent of the injuries were proximately caused by the defective welds?
Accident alone80%
Defective welds20%

I.
"Crashworthiness" is defined as the ability of a motor vehicle to protect its passengers from enhanced injuries after a collision. Barris v. Bob's Drag Chutes & Safety Equip., Inc., 685 F.2d 94, 100 (3d Cir.1982). The crashworthiness doctrine *685 was first recognized in Larsen v. General Motors Corp., 391 F.2d 495, 504-05 (8th Cir.1968). It is premised upon the manufacturer's legal duty to design and manufacture a reasonably crashworthy product. Dreisonstok v. Volkswagenwerk, A.G., 489 F.2d 1066, 1070-71 (4th Cir.1974). Thus, "a manufacturer has to include accidents among the `intended' uses of its product." Barris, supra, 685 F.2d at 100 (citation omitted). Strict liability is imposed on a manufacturer for injuries sustained in an accident involving a design or manufacturing defect that enhanced the injuries, but did not cause the accident. Seese v. Volkswagenwerk, A.G., 648 F.2d 833, 839 (3d Cir.), cert. denied, 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981).
The manufacturer is liable only for enhanced injuries, that is, injuries that would not have occurred absent the alleged defect. Larsen, supra, 391 F.2d at 503. "Enhanced injury refers to the degree by which a defect aggravates collision injuries beyond those which would have been sustained as a result of the impact or collision absent the defect." Barris, supra, 685 F.2d at 100. The crashworthiness doctrine is also referred to as the "second collision" doctrine, the accident itself being the "first collision," or "enhanced injury" doctrine. Mazda Motor Corp. v. Lindahl, 706 A.2d 526, 530 (Del.1998).
It is generally agreed that the plaintiff in a crashworthy case has the burden of establishing that the alleged defect was a substantial factor in increasing the harm beyond that which would have resulted from the first collision. Restatement (Third) of Torts: Products Liability § 16 comment a (1997). Beyond that agreement, however, there is a split of authority concerning any additional burden a plaintiff may have in apportioning damages between the first and second collision. Apportionment is generally a problem that occurs in crashworthy cases involving an indivisible injury, such as death, where it is often difficult to prove with any precision whether the alleged defect was the sole cause of the injury, or whether the second collision contributed to the injury in a substantial degree. Which party has the burden of proof on that issue can be determinative of whether a plaintiff recovers damages in such cases.
In an effort to predict what New Jersey would do on the subject, the Third Circuit, in Huddell v. Levin, 537 F.2d 726, 737-38 (3d Cir.1976), held that the plaintiff must prove not only that the alleged defect was a substantial factor in causing some increased harm, but must also prove the extent of the increased harm. If a plaintiff is unable to quantify the increased harm, the plaintiff is unable to recover. Ibid. Huddell, however, has come to represent the minority view. The majority view, referred to as the Fox-Mitchell[4] approach, shifts the burden of proving apportionment to the defendant manufacturer after the plaintiff offers some evidence that the injuries were in fact enhanced because of the defective product. See Restatement (Third) of Torts: Products Liability, supra, § 16, Reporters' Note, comment d.
The accuracy of Huddell's prediction of New Jersey law was first questioned in Crispin v. Volkswagenwerk A.G., 248 N.J.Super. 540, 569 n. 1, 591 A.2d 966 (App.Div.) (predicting that a rule placing the burden of proof of apportionment on the defendant would be more in line with recent New Jersey Supreme Court medical malpractice apportionment cases), certif. denied, 126 N.J. 385, 599 A.2d 162 (1991). Despite the caution flag raised by Crispin, the Law Division in 1993 applied Huddell to the case before it. See McLaughlin v. Nissan Motor Corp., 267 N.J.Super. 130, 134, 630 A.2d 857 (Law Div.1993). A year later, Judge Lintner, *686 recognizing that the Fox-Mitchell line of cases expressed the majority view and that the majority view was in accord with our Supreme Court's approach to apportionment in the medical malpractice context, held that the burden of apportionment should be on the defendant. Thornton v. General Motors Corp., 280 N.J.Super. 295, 303, 655 A.2d 107 (Law Div.1994). At the time of trial, the conflict in the Law Division cases had not been resolved.
Here, the judge rejected the Crispin dicta and the Thornton decision, and opted for the Huddell approach. The judge charged the jury that plaintiff had
the burden of proving by a preponderance of the credible evidence that the alleged defect enhanced the injuries sustained by Mr. Kuhlbars in the accident. There is no claim in this case ... that any defect in Michael Kuhlbars's Corvette caused the car to hydroplane, to jump the curb and to hit the tree and the brick wall. For that reason you cannot find General Motors liable for injuries that would have been sustained by him as a proximate result of those events alone. The claim against GM is instead for damages for the enhanced injuries that [plaintiff] claims occurred as the result of the alleged defect in the door beam welds. In order to prove enhanced injury, [plaintiff] must establish, again, by a preponderance of the credible evidence, first of all, what injury, if any, Mr. Kuhlbars would have sustained if the welds had not been defective as alleged and, number two, what injury, if any, was approximately caused [sic] by the defect as alleged in the welds. Recovery can be obtained from GM only for the damages flowing from the enhanced injury. If you conclude that the injuries sustained by Mr. Kuhlbars would have been the same regardless of the defect, if you find a defect to exist, then you cannot find that there has been an enhancement of the injury.
Subsequent to the trial in this case, the issue of who had the burden of proof of apportioning an indivisible injury between the first collision and the second collision was addressed in Green v. General Motors Corp., 310 N.J.Super. 507, 525-29, 709 A.2d 205 (App.Div.), certif. denied, 156 N.J. 381, 718 A.2d 1210 (1998). Judge Dreier, writing for this court, held that the trial judge in that case erred in following Huddell and in placing the burden of apportionment on the plaintiff. Id. at 528, 709 A.2d 205. The court adopted the Fox-Mitchell approach, allocating the burden of apportionment to the defendant manufacturer. Id. at 528-29, 709 A.2d 205.
Defendant argues here that the Green court's holding on this issue was dicta, because the jury in that case found plaintiff's paralysis solely attributable to the design defect, and, thus, apportionment was not an issue. We agree with defendant. Nonetheless, we find Judge Dreier's analysis of the doctrine compelling and adopt it as our own.
Therefore, we hold that in a crashworthy case, the plaintiff must prove only that a defect in the vehicle increased or enhanced the injury beyond that which would have resulted had there not been a defect. Thus, contrary to the judge's instruction in this case, plaintiff was not obliged to prove "what injury, if any, Mr. Kuhlbars would have sustained if the welds had not been defective." That is, plaintiff is not required to prove a negative. Plaintiff need only prove that the presence of the alleged defect was a substantial factor in producing an injury that would not have occurred, or would have been substantially diminished, in the absence of the defect. Restatement (Third) of Torts: Products Liability, supra, § 16 comment a; Sumnicht v. Toyota Motor Sales, U.S.A., Inc., 121 Wis.2d 338, 360 N.W.2d 2, 11 (1984). When a plaintiff has sustained that burden, the plaintiff need not quantify to what extent the second collision enhanced the injury. Rather, if the defendant seeks credit against the verdict for an injury that it claims resulted, in part, from the first collision, defendant *687 shall have the burden of proof on that issue.
In this case, the plaintiff satisfied her initial burden of proving that the welding defect caused injuries to Kuhlbars resulting in his death that would not have occurred had there been no defect in the door beam welds. To the extent that defendant contends that the injury (death) is divisible and resulted from both the first collision, for which it is not responsible, and the second collision, it was defendant's burden to quantify the extent to which each collision caused Kuhlbars' death.
Accordingly, the trial judge erred in placing on the plaintiff the burden of quantifying the extent to which second collision damages were enhanced by first collision damages.

II.
The trial judge, in her written opinion denying post-trial motions, held that while "death is indivisible [ ] as [to] result," it is capable of apportionment in terms of causation. We agree. As the judge noted, general tort law endorses the principle that "[d]amages for harm are to be apportioned among two or more causes where... there is a reasonable basis for determining the contribution of each cause to a single harm." Restatement (Second) of Torts § 433A(1)(b)(1964). Apportionment of damages based on causation has been favored in our case law. Campione v. Soden, 150 N.J. 163, 184, 695 A.2d 1364 (1997); Feldman v. Lederle Laboratories, 132 N.J. 339, 350-52, 625 A.2d 1066 (1993); Dafler v. Raymark Indus., Inc., 259 N.J.Super. 17, 35, 611 A.2d 136 (App. Div.1992), aff'd o.b., 132 N.J. 96, 622 A.2d 1305 (1993); Bendar v. Rosen, 247 N.J.Super. 219, 588 A.2d 1264 (App.Div.1991); Thornton, supra, 280 N.J.Super. at 302, 655 A.2d 107. The same principle applies to crashworthy cases. Section 16 of the Restatement (Third) of Torts: Products Liability, supra, provides:
(b) If proof supports a determination of the harm that would have resulted from other causes in the absence of the product defect, the product seller's liability is limited to the increased harm attributable solely to the product defect.
(c) If proof does not support a determination under Subsection (b) of the harm that would have resulted in the absence of the product defect, the product seller is liable for all of the plaintiff's harm attributable to the defect and other causes.
The Green court adopted these principles for use in New Jersey crashworthy cases, as do we. Green, supra, 310 N.J.Super. at 528, 709 A.2d 205.
There is no impediment to apportioning damages in this case as to causation simply because the alleged "other cause" results from Kuhlbars' conduct. While the Restatement Reporters observed that use of plaintiff's conduct in this setting is a "difficult issue" in terms of comparative fault, it is clear that a majority of jurisdictions allow plaintiff's conduct to be considered in the context of causation. Restatement (Third) of Torts: Products Liability, supra, § 16, Reporters' Note, comment f; see also Dafler, supra, 259 N.J.Super. at 28, 611 A.2d 136 (noting that apportionment rules apply "where one of the causes in question is the conduct of the plaintiff himself, whether it be negligent or innocent") (quoting Restatement (Second) of Torts § 433A comment (a) (1964)).
We recognize that in the typical product setting, New Jersey case law indicates that plaintiff's conduct is irrelevant in terms of comparative fault where it amounts to little more than negligent failure to observe the very danger that a properly manufactured or designed product would have rendered safe. See Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 158-59, 406 A.2d 140 (1979).[5] The rule is *688 grounded in policy reasons that undergird strict products liability law. Ibid. Those same policy reasons do not exist, however, where the plaintiff's conduct was a factor in the happening of the accident but not because of his or her use of the product in the traditional product liability context. In such cases, plaintiff's conduct is at least relevant on the issue of proximate cause. See Johansen v. Makita USA, Inc., 128 N.J. 86, 103, 607 A.2d 637 (1992)(holding that where comparative fault is not available as a defense, plaintiff's conduct may be relevant on proximate cause). This concept was recognized in Green. Judge Dreier wrote: "If the speed [of plaintiff's vehicle] was beyond the design limits [for making a crashworthy vehicle], speed would have been a proper factor to determine proximate cause and a later apportionment of liability." Green, supra, 310 N.J.Super. at 521, 709 A.2d 205. Thus, in this case, Kuhlbars' conduct in losing control of his vehicle and leaving the roadway, irrespective of fault, was relevant on the issue of the cause of the death producing injuries because, under the defense theory, it was that conduct which caused Kuhlbars' death producing head injuries. As will be discussed more fully later, the evidence was sufficient for a jury to conclude that the first and second collisions were concurrent causes of Kuhlbars' death.
Our discussion here of causation and apportionment should not be confused with the question of whether plaintiff's fault in causing the first collision is admissible to diminish plaintiff's recovery on comparative fault grounds where the first collision results in a defect-related enhanced injury solely caused by the second collision. The Restatement (Third) of Torts: Products Liability, supra, § 16 comment f states that such "fault is relevant in apportioning responsibility between or among the parties[.]" The Restatement's justification for the rule is that requiring a manufacturer to design a product "reasonably to prevent increased harm aims to protect persons in circumstances in which they are unable to protect themselves." Ibid. The Restatement comment, however, is at odds with this court's holding in Green. In Green, the court held that driver error in causing the first collision is irrelevant in crashworthy cases on comparative fault grounds. Green, supra, 310 N.J.Super. at 521, 709 A.2d 205. We need not engage ourselves in that debate, because the defendant here does not contend that it is entitled to a credit based on Kuhlbars' general fault in causing the first collision.
Rather, in this case, defendant addressed driver conduct, irrespective of fault, that a jury could find to be a concurrent cause of a single injury. The focus was on driver conduct as it related to apportionment of damages based on causation, not comparative fault. Plaintiff confuses the two interrelated but distinct concepts in her appellate brief.

III.
Having decided that death is capable of apportionment as to cause, we now decide whether there was sufficient evidence to permit such apportionment. As can clearly be seen from the earlier recitation of the facts, plaintiff's expert attributed Kuhlbars' death solely to the intrusion of the tree into the vehicle because of the defective welds, while the defendant's expert opined that Kuhlbars' head struck the tree and received the death-producing *689 blow before the welds on the door gave way. Neither expert suggested that trauma from the first collision combined with trauma from the second collision produced Kuhlbars' death. Thus, if the jury accepted either expert's opinion fully, there would be no basis for apportionment.
It appears from the verdict that the jury found some basis to apportion damages. Plaintiff argues that the jury's conclusion was against the weight of the evidence and that plaintiff is entitled to 100 percent of the verdict. Defendant, on the other hand, argues that there was a sufficient basis in the evidence to permit the jury to consider the question irrespective of each expert's opinion. We agree with defendant.
The jury was correctly instructed that it was free to accept that part of each expert's testimony that it found logical and credible, while rejecting such testimony that it found to be illogical or incredible. As our Supreme Court has noted:
"A jury has no duty to give controlling effect to any or all of the testimony provided by the parties' experts, even in the absence of evidence to the contrary. `The jury may adopt so much of it as appears sound, reject all of it, or adopt all of it.'"
[Waterson v. General Motors Corp., 111 N.J. 238, 248, 544 A.2d 357 (1988)(quoting Amaru v. Stratton, 209 N.J.Super. 1, 20, 506 A.2d 1225 (App. Div.1985)).]
When viewed from that perspective, it is clear that there was sufficient evidence in the record from which the jury could have accepted part of Mackay's testimony concerning the dynamics of the first collision and the movement of Kuhlbars' body within the vehicle. From that testimony, the jury could have found that Kuhlbars received substantial head trauma from contact with the tree before the defective welds in the door permitted incursion of the tree into the passenger compartment. The jury, however, did not have to accept Mackay's testimony that the trauma from the first collision was sufficient alone to have produced Kuhlbars' death. It could have found that the defective welds permitted the door beam to separate from the door frame and permitted incursion of the tree into the passenger compartment producing additional head trauma that would not have occurred had there been no manufacturing defect. That is, the jury could have found concurrent causation of the death-producing injuries.
Though the trial judge did not make the same analysis of the evidence as we have made, she found that there was sufficient evidence in the record for the jury to have made an apportionment as to the cause of Kuhlbars' death. We agree with the trial judge. Irrespective of what party had the burden of producing the evidence to enable apportionment, sufficient evidence was produced in this case to permit it. The defendant was not required to produce evidence amounting to scientific or mathematical precision as to how much each collision contributed in percentage points to Kuhlbars' ultimate death. As this court noted in Dafler, supra:
"Where a factual basis can be found for some rough practical apportionment, which limits a defendant's liability to that part of the harm of which that defendant's conduct has been a cause in fact, it is likely that the apportionment will be made."
[259 N.J.Super. at 28, 611 A.2d 136 (quoting Prosser and Keeton on Torts § 52 at 345 (5th ed.1984)).]
While "outright guesswork" should not be permitted, when expert testimony provides "a rational explanation derived from a causal analysis, the testimony should, subject to the normal discretion of the trial court, be admitted for consideration by the trier of fact." Restatement (Third) of Torts: Products Liability, supra, § 16 comment c. "[I]t is preferable in the interest of fairness to permit some rough apportionment of damages, rather than to hold the defendant entirely liable for a harm that was inflicted by separate *690 causes." Dafler, supra, 259 N.J.Super. at 31, 611 A.2d 136. Applying these principles to this case, we conclude that the evidence was sufficient to have the jury determine the issue. Therefore, the trial judge did not err in doing so.

IV.
The next question is whether the verdict relative to apportionment can stand. Defendant contends that it can, but its argument is premised on the validity of Huddell. As we have previously discussed, Huddell is no longer viable in this jurisdiction on the issue of which party has the burden of proving apportionment. To say that there was sufficient evidence in the record to allow the apportionment issue to go to the jury is one thing, but to say that it does not matter who had the burden of persuasion on that issue is yet another.
As indicated earlier, once the jury found that a manufacturing defect proximately caused enhanced injuries to Kuhlbars, the plaintiff had satisfied her burden of proof. If the defendant wanted to argue, in the alternative, that the jury could find from the evidence that the first collision, referred to in the charge as "the accident," was a concurrent cause of the death-producing head injuries, it was the defendant's burden to prove it and give the jury a basis for apportioning between the first and second collision injuries. We cannot say that the defendant carried its burden of proof on the issue as a matter of law. While we have given a reasonable interpretation of the evidence that would permit a finding of concurrent causation for Kuhlbars' death, we cannot say that no reasonable jury could disagree with us. The point is that it was a jury question, and the jury needed guidance to answer the question properly. It did not have that guidance.
Aside from failing to assign the burden of proof on apportionment to the defendant, the judge failed to explain the doctrine of concurrent causation to the jury. The first mention of the concept of apportionment was in the judge's explanation of the questions on the jury verdict sheet. As to question three, the judge said "what percent of Michael Kuhlbars' injuries were proximately caused by the accident alone and what percent of the injuries were proximately caused by the defective welds?"
The jury was left to its own devices to discern what evidence it could and could not consider in making that decision. The judge did not instruct the jury that it was focusing only on those injuries that the parties stipulated caused his deaththe head injuries. Nor did the judge instruct the jury that it was limited to causative evidence in deciding whether the first collision was a substantial contributing factor in Kuhlbars' death. Without that type of limiting instruction, the jury may have thought that his conduct in leaving the road in the first instance was relevant on that issue. See Johansen, supra, 128 N.J. at 99-100, 607 A.2d 637 (explaining why limiting instructions are necessary on such issues). Thus, the jury, in violation of Green, could have discounted the verdict by some perception of Kuhlbars' fault as a proximate cause of the first accident.
The judge also failed to instruct the jury that it could not apportion between the first and second collision unless it found that both the first collision and the welding defect (second collision) were concurrent, substantial contributing factors in producing Kuhlbars' death. Once having made that determination, the jury could then analyze and assign relative weight to the factors pertaining to causation that linked the first and second collision in order to arrive at a percentage attributable to each: essentially evidence relating to the magnitude of the forces, the direction of the forces, the reaction of the vehicle to those forces, and the movement of Kuhlbars in the vehicle in response to those forces.
Simply stated, in complex cases of this nature, the jury should be instructed on *691 legal principles in the context of the particular facts of the case and the parties' contentions, rather than on abstract principles of law. See Suter, supra, 81 N.J. at 176, 406 A.2d 140 (holding that "[t]he instruction should be tailored to the factual situation to assist the jury in performing its fact finding responsibility"). As we see it, this problem affected the second interrogatory as well as the third interrogatory. With respect to the second jury question, it must be remembered that plaintiff sued only for Kuhlbars' wrongful death. Her theory was that the welding defect permitted the tree to intrude into the passenger compartment and cause head trauma that would otherwise not have been sustained had there been no defect. Thus, the trial judge should have specifically focused the jury's attention on plaintiff's burden in that factual context, rather than simply using the generic instruction that plaintiff had the burden of proving that "the defective welds were a proximate cause of enhanced injuries to Mr. Kuhlbars." (Emphasis added.) There was evidence in this case that a jury could have relied upon to find that Kuhlbars received injuries other than head injuries as a result of the defective welds. While those injuries would qualify as enhanced injuries, they had nothing to do with Kuhlbars' death. Indeed, plaintiff sought no compensation for those injuries. While sophisticated lawyers and judges may have understood this nuance in plaintiff's case, we are not at all sure that the jury did. It is conceivable that the vagueness in this interrogatory was the basis for the 20 percent allocation to the defendant in the third interrogatory. We have no confidence that the jury's response to the second interrogatory related to the enhanced injuries that plaintiff sought to link with Kuhlbars' wrongful death.
In summary, we conclude that the error in failing to assign the proper burden of proof to the defendant on the issue of apportionment, and the failure to give the jury adequate guidance on the issues of apportionment and causation, had the capacity to affect the verdict. Thus, a new trial is required.
A new trial on all issues is not required, however, in instances where the "error is entirely distinct and separable from the other issues." Ahn v. Kim, 145 N.J. 423, 434, 678 A.2d 1073 (1996); see also Ladner v. Mercedes-Benz of N. Am., Inc., 266 N.J.Super. 481, 494, 497, 630 A.2d 308 (App.Div.1993), certif. denied, 135 N.J. 302, 639 A.2d 301 (1994). In this case, the errors we have identified did not have the capacity to affect the jury's finding as to the existence of a manufacturing defect. Accordingly, that issue need not be retried. The remaining issues, however, are affected by the errors and are so intertwined that a re-trial as to those issues is necessary.
Reversed and remanded for a new trial in accord with this opinion.
NOTES
[1] A. Better Deal, Inc. was the seller of the used Corvette. It was dismissed from the litigation before trial.
[2] "Crashworthiness" is defined in the Motor Vehicle Information and Cost Savings Act, 49 U.S.C.A. § 32301(1), as "the protection a passenger motor vehicle gives its passengers against personal injury or death from a motor vehicle accident."
[3] Defendant's expert theorized that Kuhlbars had broken his wrist as a result of his "interaction with the steering wheel."
[4] Mitchell v. Volkswagenwerk, AG, 669 F.2d 1199, 1206-08 (8th Cir.1982) (the burden of proof of apportionment is on the defendant under Minnesota law); Fox v. Ford Motor Co., 575 F.2d 774, 787-88 (10th Cir.1978)(the burden of proof of apportionment is on the defendant manufacturer under Wyoming law).
[5] In a non-workplace setting, plaintiff's conduct can be used to reduce damages where the product user has proceeded in the face of a known danger. Suter, supra. However, plaintiff's conduct may be relevant on comparative fault in other circumstances as well. As for example, "the plaintiff may have been speeding in a vehicle and that speed might have been a cause of an accident which was also caused by a defect in the vehicle." Dreier, Goldman & Katz, Current N.J. Products Liability & Toxic Torts Law § 16:5 (1999). Recently, this court held that evidence of plaintiff-decedent's intoxication was admissible on the issue of comparative fault because that conduct had nothing to do with the plaintiff's lack of awareness of the alleged defect in the axle of the vehicle, which plaintiff alleged was the cause of the accident. Wallace v. Ford Motor Co., 318 N.J.Super. 427, 723 A.2d 1226 (App.Div.1999).