794 A.2d 237

JACQUELINE HUMENIK, AN INFANT BY HER GUARDIAN AD LITEM, JOSEPH HUMENIK AND JOSEPH HUMENIK, INDIVIDUALLY, PLAINTIFFS–RESPONDENTS, v. TAFT GRAY, III AND TAFT GRAY, JR., DEFENDANTS/THIRD PARTY PLAINTIFFS, v. ALLSTATE INSURANCE COMPANY, A NEW JERSEY CORPORATION, THIRD PARTY DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 5, 2002—Decided April 10, 2002.

8

Before Judges STERN, LINTNER and PARKER.

*Fredric Paul Gallin* argued the cause for appellant (*Methfessel & Werbel,* attorneys; *Mr. Gallin,* on the brief).

*James M. Curran* argued the cause for respondents (*Heilman & Curran,* attorneys; *Mr. Curran,* on the brief).

The opinion of the court was delivered by

LINTNER, J.A.D.

Allstate Insurance Company (Allstate) appeals from an adverse jury verdict in a declaratory judgment action finding that the injuries sustained by plaintiff Jacqueline Humenik were not the type which may reasonably be expected to result from the intentional acts of defendant Taft Gray, III (Gray). Allstate raises the following points on appeal.

POINT I

IT WAS ERROR TO INFORM THE JURY THAT IF ALLSTATE WAS SUC-CESSFUL THAT GRAY WOULD HAVE TO PAY A $150,000 VERDICT AND HUMENIK MIGHT NOT BE ABLE TO COLLECT IT.

POINT II

THE COURT SHOULD HAVE ALLOWED AN ALLOCATION BETWEEN THOSE INJURIES WHICH WERE REASONABLY FORESEEABLE AND THOSE WHICH WERE NOT.

POINT III

THE VERDICT SHEET IMPROPERLY CONTAINED TWO QUESTIONS.

We reject Allstate's contentions and affirm.

We combine the relevant facts and procedural history which are not substantially disputed. Gray, a high school freshman, intentionally shoved plaintiff, a sophomore, into a locker at the Scotch Plains/Fanwood High School. Plaintiff instituted a personal injury suit against Gray, who in turn filed a third-party action against Allstate seeking a declaration of coverage under a homeowner's policy issued to his father, which contained the following exclusion:

Losses We Do Not Cover:

1. We do not cover any bodily injury or property damage which may reasonably be expected to result from the intentional or criminal acts of an insured person or which are in fact intended by an insured person.

Following a bench trial on the declaratory judgment action, the trial judge found that Gray was negligent, and entered judgment against Allstate requiring it to defend and indemnify Gray. Almost one year later, a jury returned a verdict against Gray, awarding plaintiff $150,000.

Allstate appealed the declaratory judgment and the jury verdict. In an unpublished opinion we affirmed the jury verdict. However, we found that Gray's acts were intentional but nevertheless covered by the expressed provisions of Allstate's policy exclusion so long as the injuries sustained by plaintiff were not "reasonably expected to result." Thus, we vacated the judge's finding of insurance coverage and remanded "for the limited purpose of deeming whether the bodily harm inflicted on plaintiff was of a type 'which may reasonably be expected to result' from Gray's intentional acts." We added that "[i]f the consequences of those acts were remote, highly improbable or extraordinary, then coverage is to be found."

Following a three-day trial, a jury found that the injuries inflicted upon plaintiff were not the type which may reasonably be expected to result form Gray's intentional acts. The trial focused upon plaintiff's injuries. The testimony of Dr. Kenneth Zahl, a board-certified anesthesiologist with a sub-specialty in pain management and pain control medicine, was presented by plaintiff via

videotape deposition. He testified that plaintiff's history revealed that she developed symptoms of a common sprain to her left wrist resulting in the application of a temporary splint. However, the pain worsened and plaintiff was referred to a hand surgeon who diagnosed instability in the wrist and intervened surgically to perform a limited fusion of the wrist, which required the grafting of piece of bone taken from plaintiff's iliac crest.

Plaintiff ultimately came under Dr. Zahl's care and treatment. Dr. Zahl diagnosed Reflex Sympathetic Dystrophy or Chronic Regional Pain Syndrome (RSD). He described plaintiff as suffering from hypersensitivity to light touching and "magnification pain" with normal touching. He explained RSD as the development of sympathetic and reflex reactions to what otherwise is a "fairly trivial injury." He stated:

> The pain continues to send more signals to the brain or other areas of the spinal cord and then the symptoms then get reflected back on the hand or the foot. And the dystrophy occurs ... there are permanent changes in the bones, in the ligaments, in the tissues, or in the skin.... It's what we call a vicious cycle. The more pain there is, the more is perceived and then there is more pain outflow going back to the original source of injury.

Dr. Zahl's treatment consisted of injecting anesthesia into a portion of the sixth cervical vertebrae. He performed nine such injections over a period of time, with the last injection being given on December 4, 1997. Dr. Zahl opined that the RSD sustained by plaintiff is a permanent condition for which there is no known cure and was causally related to the pushing incident. He related that the condition is "very rare occurrence ... atypical and very uncommon." He acknowledged that, in his opinion, the injuries sustained by plaintiff were not reasonably expected to result from a push into a locker or hard surface.

On cross-examination, Dr. Zahl conceded that a wrist injury such as a sprain is not an uncommon occurrence under the circumstances presented. He also recognized that a fractured wrist would not be rare in a bad fall but, "most people [who] do fall for one reason or another don't always break their wrist." He stated that from plaintiff's history it was initially believed that she

suffered from a sprain but she was later diagnosed with a fracture that did not heal, thus requiring surgery. He testified that plaintiff's condition, which he described as a wrist fracture that developed into a need for repetitive procedures and ultimately RSD, was a "unique complication and fairly rare" in someone plaintiff's age.

Allstate presented two medical experts. Dr. Eli Curi, a vascular surgeon, testified that plaintiff was not suffering from RSD. Dr. Curi conceded on cross-examination that plaintiff had preexisting Tourette's Syndrome, a "hetergenetic [condition] which includes both motor and behavior dysfunction [which] probably has been an important factor in the hypersensitivity and slow progress for the achievement of maximum recovery." Dr. David Grefinger, an orthopedic surgeon, testified that the diagnosis of RSD had never been firmly established and plaintiff's symptoms were not consistent with the syndrome. He felt that plaintiff sustained a sprain that developed into a ligament injury causing instability in three bones of the wrist, thus requiring fusion surgery. On cross-examination Grefinger acknowledged that when people fall or hit their wrist a smaller percent would sustain a fracture than those sustaining sprains and contusions. He also admitted that fusions are unusual and rarely necessary and "RSD is not seen often."

During jury selection, the trial judge advised the jury:

In this case, the Gray family had sued their insurance company, Allstate Insurance Company, because they had a homeowner's policy. And under the terms of the policy, they allege that Allstate should have defended them and indemnify them for any loss that occurred as a result of this incident.

Allstate Insurance Company has denied coverage because under the terms of their policy, Section II, family liability, et cetera, it says, "Losses we do not cover." One, "We do not cover any bodily injury or property damages," property document is not in the case, "which may reasonably be expected to result from the intentional or criminal acts of an insured person or which are in fact intended by an insured person."

And there's no question that Mr. Gray was an insured person under the terms of the policy.

And so that Mr. Gray, the Gray family, and the plaintiff, since the plaintiff has an interest because ... the plaintiff got a verdict against Mr. Taft, they seek compensation. They're entitled to participate in this declaratory judgment, when

you sue your insurance company for coverage, because they now, once the judgment is entered against the person they sued, they have an interest to be compensated and they seek to have Allstate, the insurance company cover their insured so that they can get their judgment.

And that's what this—basically, this case is about. And you're going to have to decide certain issues concerning whether or not the bodily injury ... may reasonably be expected to result from this intentional ... And that he intended to push her.

And at the end of the case I'm going to charge you as to the applicable law that you have to apply to determine whether or not this exclusion applies denying coverage to Mr. Gray; and, therefore, denying the fact that the plaintiff may ... get the money from the insurance company rather than the insure[d].

That's what this case is about.

Allstate voiced its objection to the trial judge and counsel discussing the amount of the personal injury verdict and who would be responsible for payment. Denying Allstate's request, the following colloquy took place.

[ALLSTATE'S COUNSEL]: Yes. I also have an objection, Your Honor, to any discussion as to who's responsible for paying the verdict which—

THE COURT: Who's responsible for what?

[ALLSTATE'S COUNSEL]: For paying the verdict.

THE COURT: How could you say this? This is a declaratory judgment action. It's against you for asking you to pay them.

[ALLSTATE'S COUNSEL]: But I don't think the jury should be told, Oh, by the way, if you don't find against Allstate, poor Mr. Gray is going to—

THE COURT: Absolutely they're going to be told that. That's why—you wanted a jury. They're going to try it in a vacuum? They are suing you. Taft is suing you saying, I had insurance. I got a hundred fifty thousand dollar verdict against me and the insurance company won't pay it. And there's an exclusion, and we say, the exclusion doesn't apply. How could you not? ...

that's exactly what this is about.

[ALLSTATE'S COUNSEL]: The jury doesn't have to know the amount of the verdict ... at all. I don't see how.

THE COURT: What?

[ALLSTATE'S COUNSEL]: I don't see how. I don't see why the jury has to know what the amount of the verdict is at all.

THE COURT: Because we don't try cases in a vacuum. It's a real life case, and just like in a death action, someone says, why are you showing a picture of the plaintiff, the decedent? Because—because the decedent is the party and they've got to realize someone's life was taken, and therefore, they have a right to see that this is not fair.

[ALLSTATE'S COUNSEL]: Because the issue before this jury is whether these acts were reasonably expected. What the verdict is ... how does that relate to whether these injuries are reasonably expected or not?

THE COURT: Because it's called a trial. I'm telling you, because I believe that when you try to—what you won't tell the jury, and therefore, the jury has a right to understand in the context of what this case is about, what their verdict is.... So I'm going to do it.

## In opening argument plaintiff's counsel said:

The verdict, when we tried this case, was a hundred fifty thousand dollars against Taft Gray. And Allstate Insurance Company from square one has taken the position, we're not paying them.

. .

You should know, also, that the verdict and the judgment against Taft Gray, III exists. The verdict has been rendered. The judgment exists. This is Allstate saying, we're not paying. It doesn't mean it's going away. It means we're not paying. They're not paying the coverage. They're not paying the indemnification that his father contracted for, that his father paid premiums for, and that his father had a reasonable expectation for.

## The trial judge stated the following during his charge to the jury:

Taft Gray, he's an insured. And under the policy he said, whatever happened, I'm entitled to coverage.

Now, the plaintiff, also the girl who was hurt, she also participates in this because she is what's called a third party beneficiary. She said look ... I got hurt. I'm entitled to collect. Now, that should not enter into your minds, even though—because I wanted to explain why they're here. Because it's not—you're not to think about that. I will focus in on what you are to make a determination. Not the ultimate outcome, but only what you have to decide.

## The verdict sheet submitted to the jury contained two questions:

1. Were the injuries inflicted on Jacqueline Humenik the type which may be reasonably expected to result from Gray's intentional act?

 Yes_____ No_____

 If 'Yes' answer question 2.

 If 'No' cease your deliberations.

2. Were the consequences of Tate Gray's acts remote, highly improbable or extraordinary?

 Yes_____ No_____

In a unanimous verdict the jury responded "no" to the first question.

First, Allstate asserts that the judge erred in (1) permitting plaintiff's counsel to advise the jury respecting the amount of the personal injury verdict, (2) informing the jury that if Allstate

did not pay the verdict it would have to come from the insured, and (3) implying that plaintiff might not be able to collect the verdict if she does not prevail as a third-party beneficiary. Essentially, Allstate argues that the combined effect of these asserted errors was to focus the jury on plaintiff's ability to collect, rather than the issue to be decided. We consider these arguments in the context of the cases dealing with the ultimate outcome charge.

The ultimate outcome charge was first approved in *Roman v. Mitchell*, 82 *N.J.* 336, 345, 413 *A.*2d 322 (1980), in which the Court concluded that a jury should be informed of the legal effect of a verdict in a comparative negligence case. The decision in *Roman* allowed the jury to make an "informed apportionment of fault" by being made aware of our modified comparative negligence statute, which barred plaintiff from recovery if plaintiff was determined to be at least fifty-one percent negligent. *Weiss v. Goldfarb*, 154 *N.J.* 468, 477, 713 *A.*2d 427 (1998). The decision in *Fischer v. Canario*, 143 *N.J.* 235, 251–54, 670 *A.*2d 516 (1996), followed *Roman* and held that an ultimate outcome charge should be given in an increased-risk, lost-chance of recovery medical malpractice case. Again, the Court reasoned that the ultimate outcome charge was required to inform the jury of the legal effect of the apportionment of causation between harm caused by a defendant's negligence and that caused by the patient's pre-existing condition. *Ibid.*

In *Johnson v. Mountainside Hospital*, 239 *N.J.Super.* 312, 571 *A.*2d 318 (App.Div.1990), the issue was first raised whether the ultimate outcome charge should be used to inform a jury of the statutorily limited liability of a hospital. We distinguished such situations from those cases where the ultimate outcome concerned the issue of apportionment of fault, stating that the effect of such a charge

> could only be to persuade the jury to shift to the other defendants some amount for which it had concluded the hospital, and not the other defendants was justly responsible. . . . [T]here is no reason to believe that a purpose of the statute was to shift any part of those consequences to other parties merely because they happen to be caught up in the same law suit as the hospital.

[*Id.* at 324–25, 571 A.2d 318.]

Similarly, in *Weiss, supra,* 154 *N.J.* at 479, 713 *A.*2d 427, the Supreme Court agreed with our rationale in *Johnson,* observing that an ultimate outcome charge embracing the statutory limited liability of a hospital "focuses on money and not percentages of fault." The same reasons apply when considering the multitude of cases dealing with the prejudicial effect of revealing whether a party is insured or not in a negligence case. *Brandimarte v. Green,* 37 *N.J.* 557, 562–63, 182 *A.*2d 562 (1962); *Demers v. Snyder,* 282 *N.J.Super.* 50, 58, 659 *A.*2d 495 (App.Div.1995); *Pickett v. Bevacqua,* 273 *N.J.Super.* 1, 5–6, 640 *A.*2d 1173 (App. Div.1994); *Haid v. Loderstedt,* 45 *N.J.Super.* 547, 550–52, 133 *A.*2d 655 (App.Div.1957); *Sutton v. Bell,* 79 *N.J.L.* 507, 510, 77 *A.* 42 (E.& A.1910). Reference to insurance coverage "might even suggest that a larger award may be appropriate because a 'deep pocket' is available," *Weiss, supra,* 154 *N.J.* at 480, 713 *A.*2d 427, whereas, knowledge that a defendant is uninsured "may engender sympathy for that defendant to the prejudice of the plaintiff." *Ibid.* In *Wanetick v. Gateway Mitsubishi,* 163 *N.J.* 484, 750 *A.*2d 79 (2000), the Court held that a jury should be advised about the treble damages concept in consumer fraud cases because it deals with punitive damages and " 'has nothing to do with whether there is a pocket out of which a judgment may be satisfied.' " *Id.* at 494, 750 *A.*2d 79 (quoting *Wanetick v. Gateway Mitsubishi,* 318 *N.J.Super.* 156, 165, 723 *A.*2d 100 (App.Div.1999)).

Here, Allstate asserts that the judge's reference, in his charge, to plaintiff's presence as third-party beneficiary seeking to collect Gray's insurance coverage, combined with his preliminary statement that plaintiff was "seeking to have the insurance company cover their insured so they can get their judgment," and plaintiff's revelation of the amount of the personal injury judgment, interfered with the jury's ability to decide the issue at hand by focusing its attention on money and Allstate's ability to pay. We do not believe that the indirect reference to Allstate's ability to pay by the use of the word "collect" has the same prejudicial effect in a coverage case as it would in a negligence case.

An examination of the record, in light of the prohibition against revealing a party's ability or inability to pay or both, convinces us that the trial judge's references to plaintiff's desire to collect her judgment from Allstate, rather than Gray, were harmless in light of the circumstances of this case. All three parties were present and represented before the jury. The jury was well aware that both plaintiff and Gray were seeking coverage from Allstate. Thus, the statement that plaintiff was seeking to collect her judgment against Allstate was obvious from the positions of the parties. The mere fact that it was pointed out by the judge cannot be considered clearly capable of producing an unjust result. R. 2:10–2. Furthermore, contrary to Allstate's assertion, nothing was said by either the judge or the attorneys concerning the inability of Gray to pay the judgment. Even if such a statement was made, we have serious doubts that it would be unduly prejudicial as Gray was only fourteen years old at the time of the incident and a college student at the time of the trial. Surely, it is reasonable to assume that the jury may have come to the same conclusion if, in fact, the issue was discussed during deliberations. The important thing here is that the trial judge specifically told the jury, after explaining why plaintiff was participating in the trial, that it was to focus on the issue they were to determine "not the ultimate outcome."

Although knowledge of the amount of the judgment may not have been directly related to the issue to be decided, we cannot say that it created undue prejudice. The jury was fully informed about the nature and seriousness of the injuries sustained by plaintiff. Allstate defended by producing doctors that questioned whether plaintiff suffered from RSD, presumably to concentrate attention on the wrist injury, which would be more likely to result from a push into a locker. However, Allstate's orthopedist, Dr. Grefinger, confirmed that plaintiff sustained an acute injury involving the ligaments, requiring a partial fusion of three wrist bones, resulting in the loss of some wrist function. He not only acknowledged the seriousness of the injury but also that the need for a fusion is unusual and rare. Given the nature of the surgery

required and the complications sustained, we are satisfied that the jury's awareness of the prior damage verdict did not result in a manifest injustice.

■ Allstate next asserts that the trial judge erred in refusing to permit it to argue apportionment of damages. Prior to the presentation of testimony, Allstate raised the issue of apportionment of injury, saying:

[ALLSTATE'S COUNSEL]: Your Honor . . there may be a basis for apportioning that which is reasonably expected from that which is not

. . . .

If I were to punch somebody in the nose with the intent to injure them or break their nose, and they go on to have a heart attack, which is completely improbable, I still don't think that the nose injury becomes covered just because he had an additional result.

. .

And Dr. Zahl [plaintiff's doctor] admitted during [his] deposition that the orthopedic component does fall within what is reasonably expected. That if a girl was thrown into lockers by a boy, a wrist injury can be reasonably expected.

So ... at a minimum, a certain portion of this injury ... does fall within reasonably expected. Whether the Reflex Sympathetic Dystrophy component falls within reasonably expected is a separate issue, but I think there should be a basis that if the jury does find she has RSD and that is not reasonably expected, that the orthopedic component would be.

Following the playing of Dr. Zahl's testimony, Allstate requested apportionment of damages based upon what it described as "two components to the injury." Allstate contended that, based upon Dr. Zahl's testimony, the injury could be broken down into two components: (1) orthopedic (sprain and fracture) and (2) RSD. The trial judge denied the request stating:

Well, that—I'm not going behind a jury verdict of a hundred fifty thousand dollars so you—so they can determine 20—50 percent of it was not remote and 50 percent—how do we know?

How about if the jury found 95 percent of it has to do with this specific injury and the other five percent has to do with the—with this minor thing?

■ It is a well-established principle that where there is an aggravation of a pre-existing injury resulting from the tortious acts of a defendant, an otherwise innocent plaintiff is not required to establish what portion of the eventual damages are attributed to the defendant's conduct. *Fosgate v. Corona,* 66 *N.J.* 268, 272–

73, 330 *A.2d* 355 (1974). Instead, the burden of proof shifts to the culpable defendant, who is held responsible for all the damages, absent a showing by the defendant that those damages for which the defendant is responsible are capable of some reasonable apportionment and what those damages are. *Ibid.* This same principle has been applied in cumulative-injury products liability and crashworthiness cases. *See Poliseno v. General Motors Corp.,* 328 *N.J.Super.* 41, 55, 744 *A.2d* 679 (App.Div.) *certif. denied,* 165 *N.J.* 138, 754 *A.2d* 1213 (2000); *Sholtis v. American Cyanamid Co.,* 238 *N.J.Super.* 8, 28, 568 *A.2d* 1196 (App.Div.1989). When it comes to apportionment of injury, plaintiff need not prove a negative, in this case those particular injuries that would have been reasonably expected, but only that the injury sustained was not a type which may reasonably be expected to result from Gray's conduct. Once a plaintiff has sustained that burden, the plaintiff need not quantify to what extent the injury sustained was not the type reasonably expected to result. Rather, where a defendant seeks a credit against a verdict for injury which it claims is not causally related, the burden of proof on that issue rests with the defendants. *Id.* at 55, 568 *A.2d* 1196. The defendant must not only prove that the injury is capable of some reasonable apportionment or severability, but also the extent to which it is allocable to causation. *Bendar v. Rosen,* 247 *N.J.Super.* 219, 233, 588 *A.2d* 1264 (App.Div.1991).

Plaintiff points out that the first time defendant raised the issue of apportionment of injury respecting causation was after trial had commenced. We note that Allstate defended the coverage case using the same medical expert reports it used in defense of the personal injury case. As the judge pointed out, none of those reports addressed the issue of apportionment. Our pre-trial practice is designed to eliminate the element of surprise at trial by requiring a litigant to disclose the facts and theories upon which a cause of action or defense is based. *See Saia v. Bellizio,* 103 *N.J.Super.* 465, 468, 247 *A.2d* 683 (App.Div.), *aff'd,* 53 *N.J.* 24, 247 *A.2d* 865 (1968). This basic principle is designed to ensure that the outcome of litigation shall depend on its merits in the light of

all of the available facts, rather than the last minute craftiness on the part of either party. *Lang v. Morgan's Home Equipment Corp.*, 6 *N.J.* 333, 338, 78 *A.*2d 705 (1951). To permit last-minute changes in strategy would be "akin to trial by ambush." *Plaza 12 Associates v. Carteret Borough*, 280 *N.J.Super.* 471, 477, 655 *A.*2d 961 (App.Div.1995).

 Allstate did not raise the issue of apportionment of injury prior to trial nor did its medical experts address the issue in their pretrial submissions or their trial testimony. At the very least, Allstate was required to give some advanced indication that it would rely on a rational explanation of an expert that plaintiff's injury was severable based upon a causal analysis. *Poliseno, supra*, 328 *N.J.Super.* at 60, 744 *A.*2d 679. Although Allstate's cross-examination of Dr. Zahl embraced the relative likelihood that sprains, fractures and RSD could result from the mechanism of injury, he never testified that the injury and complications actually sustained by plaintiff were capable of reasonable apportionment or how he would apportion them if he could. We see no merit in Allstate's contention that the trial judge erred in refusing to permit the jury to allocate between those injuries which were reasonably foreseeable and those which were not. Simply put, the proofs were not there.

Finally, Allstate contends that the verdict sheet was improper because it contained two questions. We agree that the second question was not necessary, given the choice of a "yes" or "no" response to the first question. However, the second question was not implicated given the jury's "no" response to the first. We conclude therefore that the error was harmless. *R.* 2:10–2.

Affirmed.