801 A.2d 423 (2002)
353 N.J. Super. 74
Gregory J. DOMURAT, Plaintiff-Appellant,
v.
CIBA SPECIALTY CHEMICALS CORPORATION, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued April 23, 2002.
Decided July 5, 2002.
*425 Edward J. Nolan, Hackensack, argued the cause for appellant (Deutsch, Resnick, Green & Gramigna, attorneys; Mr. Nolan, on the brief).
Marvin M. Goldstein, Newark, argued the cause for respondent (Proskauer Rose, attorneys; Mr. Goldstein and Devora L. Lindeman, on the brief).
Before Judges COLLESTER, LINTNER and PARKER.
*424 The opinion of the court was delivered by PARKER, J.A.D.
Plaintiff appeals from a jury verdict in favor of defendant in an employment discrimination case under the Law Against Discrimination (LAD). N.J.S.A. 10:5-1 to -42. Plaintiff alleged that he was wrongfully discharged by Ciba Specialty Chemicals Corporation (Ciba) in violation of the LAD because of his age (50) and his handicaps (Attention Deficit Disorder (ADD), alcoholism, depression and Lyme disease)[1]. We affirm.
Prior to his employment by Ciba, plaintiff had a history of academic and employment success. He earned an Associates Degree summa cum laude and was valedictorian of his junior college class in 1966. In 1968, he earned his Bachelor of Science degree with a major in botany and a minor in chemistry. After graduating from college, he held a number of jobs with increasing responsibilities.
Plaintiff was hired by Ciba as a Technical Sales Representative on September 1, 1978, to sell and market Ciba's pigments to industrial customers. He worked from his home in New Jersey and reported to a supervisor in Ciba's Newport, Delaware, facility. He was promoted to Senior Technical Sales Representative in the late 1980's. In that position, he was responsible for major national accounts. His job responsibilities included preparing written reports, such as: (1) call reports, documenting key events with customers and customer needs, to identify sales opportunities and develop new products; (2) monthly reports describing activities in his sales territory; (3) quarterly reports to advise customers on the work Ciba did on their behalf during the quarter; and (5) expense reports. Plaintiff submitted these reports to his Delaware-based managers. Plaintiff was also responsible for developing action plans related to market segment sales strategies.
*426 Plaintiff received good annual appraisals throughout his years at Ciba until 1991. From 1985 to 1989, his annual appraisals indicated that he met or exceeded his job requirements. In 1990, he was rated a "valued contributor" and received satisfactory ratings in all performance skill factors. His supervisor testified that prior to 1991, plaintiff's customer relationships were good and, although his reporting was not perfect, he "met expectations" in this area.
In 1991, plaintiff's performance deteriorated significantly. In the early part of that year, plaintiff was filing his reports timely. By July, however, his reporting had become sporadic and he had not developed customer-specific business plans. His supervisor, Christopher Whiston, rated his performance for that year below the lowest ranking and plaintiff was placed on a ninety-day performance probation. In a written response to his 1991 evaluation, plaintiff acknowledged that:
The severity of this review has reopened my eyes and mind to the overall requirements and responsibilities of my position as a Senior Tech. Sales Rep. within the Pigments Division. Some personal family matters over the past several years have diverted my attention away from some of these important responsibilities. While I don't believe that my overall territory customer responsibilities have been neglected, certain job requirements have been lacking and extra effort is in order.
I understand the objectives and terms for my continued employment with Ciba-Geigy. I can and do rededicate myself to fulfilling all of the requirements of my position and look forward to being judged a valued contributor, and more, to the Pigments Division of Ciba-Geigy.
Plaintiff's ninety-day probation required him to perform the basic functions of his job, such as making and documenting customer needs and problems through call reports, analyzing potential opportunities for expanding Ciba's market and submitting all reports on time. Plaintiff successfully completed his probationary requirements by April 1992. His 1992 and 1993 performance appraisals indicated that he was, once again, a "valued contributor." Whiston considered plaintiff "a valuable part of the organization" because he had a lot of years of experience, he had developed customer relations, he understood the business and "[h]e was intelligent, likeable, friendly. He was a strong combination of... factors."
In 1994, Whiston was promoted and plaintiff's new supervisor was Paul Legnetti. Legnetti had been employed by Ciba since 1981 and had worked with plaintiff from 1981 to 1983, traveling with him five or six times a year. Legnetti had a high regard for plaintiff and "thought Greg was a competent professional salesperson, always ... highly regarded by his customers, ... was well-liked within the organization." Legnetti rated plaintiff a "valued contributor" in his 1994 annual appraisal but noted "disappointing results" in plaintiff's Dispersion House Study, "not so much from ... the information gathered as from the reporting of the results." The Dispersion House Study was assigned to plaintiff during 1994, requiring him to do a market analysis of sales opportunities in the specialized dispersion industry. He had been assigned similar studies in the past.
In the summer of 1994, plaintiff again began experiencing personal problems and by early 1995, four of his key national accounts complained to Legnetti about lack of services. Specifically, the complaints indicated that plaintiff *427 was not following up on a number of items ... in order to support and fulfill that customer's expectations, that letters about pricing or about other commitments that we were making to those customers were not being delivered on a timely basis, that the overall level of support and commitment that they perceived when Greg was representing Ciba had declined.... [O]ne customer related to [Legnetti] that it almost looked as though Greg didn't know very much about their business anymore.
That complaint was from a very long-term customer who had known plaintiff for a long time.
Plaintiff testified that he had been a "social drinker" until 1991 when he stopped drinking altogether because his wife threw him out of the house for having "beer breath." He subsequently attended Alcoholics Anonymous for three months at his wife's urging and did not drink alcohol at all. In the summer of 1994, however, he began drinking again. At the same time, plaintiff's wife had medical problems for which she was taking a narcotic pain killer and plaintiff began to abuse her medication. His son was being treated for Attention Deficit Disorder (ADD), and plaintiff abused his son's medication as well.
In January 1995, plaintiff saw a psychiatrist, Dr. Jay Kuris, and told Dr. Kuris that he thought he had ADD and that he was an alcoholic. Plaintiff testified that Dr. Kuris prescribed Cylert for ADD, Wellbutrin for depression and Klonopin to help him sleep and stop drinking alcohol. Dr. Kuris did not testify.
Later in 1995, plaintiff's performance with one customer became so seriously deficient that Legnetti assigned the customer to another sales representative. Legnetti himself observed a general decline in plaintiff's performance: his reports became sporadic, lacked their former quality and no longer contained necessary details. Legnetti spoke to plaintiff about his observations and the customer complaints "on a fairly regular basis." He asked plaintiff if there was anything causing the problems and plaintiff told him "that he had some personal issues at home that required a bit of his attention; his wife wasn't feeling well, ... he had some issues with his son that again required some of his attention, ... and thathe had been doing personal projects and things like that around the house that took up a bit of his time." Legnetti took no action at that time, however, hoping plaintiff would work out the problem.
In June 1995, Legnetti traveled with plaintiff on a number of sales calls and personally observed plaintiff's poor performance in front of customers. He observed that plaintiff was confused, disorganized, "didn't recall the details of prior conversations or agreements with those customers, [and] that the overall preparation and analysis that's required before one goes to see a major customer hadn't occurred." Legnetti also observed that plaintiff's driving was erratic, "that he appeared inattentive while he was driving, speeding up and slowing down ... in the middle lane. Veering over to make a quick exit at the exit ramp."
Legnetti spoke with plaintiff about his observations and plaintiff admitted that he was unprepared for the calls and had forgotten to bring along necessary documents. He also admitted that he was "not functioning to [his] full capacity," and that he was experiencing a number of personal problems on new medications he was taking. He told Legnetti his doctors thought he might have ADD.
Legnetti reported plaintiff's poor performance to Whiston, now Legnetti's supervisor, and they agreed to place plaintiff on *428 probation again, hoping plaintiff would respond as he did in 1992. Before placing plaintiff on probation, however, Legnetti described the situation to John DeSousa, Ciba's Human Resources Manager, who became concerned that plaintiff's erratic driving might be caused by substance abuse. DeSousa recommended that plaintiff be seen by Ciba's on-site Health Services Department (Health Services) in Newport, Delaware.
Plaintiff went to Delaware on July 13, 1995, where he met with Legnetti to discuss performance issues and then with Kay Ciabattoni, an Occupational Health Nurse and head of the on-site Health Services. Plaintiff told Ciabattoni that he was receiving psychotherapy and medication for ADD and discussed his drinking history and his various ailments, including suspected Lyme Disease and a recent shoulder injury. Plaintiff showed Ciabattoni the ten to twelve different medications he was taking, including a narcotic pain killer and an over-the-counter allergy medication.
Plaintiff met with Dr. David Jesic, an on-duty contract doctor who worked part-time at Health Services. Ciabattoni and Dr. Jesic suggested that plaintiff be evaluated at Bowling Green, a local drug and alcohol treatment center, to determine whether the multiple medications were causing his lack of concentration, difficulty driving and other recent problems. Ciabattoni was aware that plaintiff had been taking his wife's pain medication and was concerned that "not all of [plaintiff's] doctors knew ... all of the other medications that other doctors were prescribing."
Plaintiff was evaluated at Bowling Green on July 25, 1995, where it was determined that he was over-medicated and needed to taper off on some of the drugs. Ciabattoni approved plaintiff's request for evaluation and treatment at Carrier Clinic, closer to his home.
On July 28, 1995, plaintiff was evaluated at Carrier by a psychiatrist, Dr. Patel. He gave the same medical history he had provided to Health Services and told Dr. Patel that he was a "recovering alcoholic" but had stopped drinking in May 1995. Dr. Patel told plaintiff he was "probably taking too many drugs," and that he needed to taper off Klonopin, which has a sedative effect. Dr. Patel reported to Ciabattoni that plaintiff's performance problems were related to the medications he was taking and recommended that plaintiff become "affiliated with some sort of an AA group" and with Carrier's Out-Patient Alcohol Treatment Services (OATS). After attending only one session at OATS, however, plaintiff decided he did not need the program because he had already stopped drinking on his own.
On July 27, the day he was evaluated at Carrier, plaintiff requested and was granted work restriction limiting him to paperwork at home because he was uncomfortable driving with all the medications he was taking. On August 10, 1995, plaintiff requested, and was granted, an extension of the work restriction because he was still feeling the effects of the medications. On August 16, 1995, plaintiff saw a new psychiatrist, Dr. Vasquez, who specialized in ADD and substance abuse. Dr. Vasquez recommended that plaintiff attend ninety AA meetings in ninety days, but plaintiff declined to do so.
On August 25, 1995, plaintiff was examined at Health Services and cleared for return to a full work schedule. Dr. Vasquez, his treating psychiatrist, completed a "return to work" form indicating plaintiff's diagnosis was "alcohol dependence." Plaintiff did not request any further work restrictions or accommodations from Ciba.
*429 That same day, August 25, plaintiff met with Whiston and DeSousa in Delaware and they informed him that he was being placed on probation for ninety days and, if his performance did not improve, he would be subject to "further disciplinary action up to and including termination of [his] employment." As part of his probationary requirements, plaintiff communicated regularly with Legnetti to review his progress. Legnetti informed plaintiff that he was not meeting his performance objectives satisfactorily. Legnetti testified that plaintiff acknowledged his failures, claiming that personal/family issues were taking up a substantial amount of his time and preventing him from completing the assigned projects. Legnetti stated that plaintiff did not claim at any time that his medical condition prevented him from performing his job; plaintiff only mentioned that he was receiving continuing treatment for his Lyme Disease and shoulder problems.
Plaintiff claimed, however, that he asked Legnetti to be relieved of his participation on the International Standards Organization (ISO) Team, so he could have more time to complete his assigned projects and to review a market opportunities analysis completed by another sales representative. Plaintiff testified that Legnetti refused the request, but Mark Dunn and Michael Williams, the ISO team leaders, testified that plaintiff was not assigned to any ISO audits between August and November 1995. In October 1995, plaintiff volunteered to work on the ISO Auditor Steering Committee but attended only one committee meeting and never asked to be relieved of his participation.
Legnetti testified that plaintiff did not successfully meet the objectives of his performance probation, notwithstanding the numerous extensions of time he was given. Legnetti said that he observed a further decline in plaintiff's performance during the probationary period. Plaintiff admitted that he did not meet the probationary performance objectives, despite extensions of time granted by Legnetti.
As a result of the "downward spiral" in plaintiff's performance, on November 17, 1995, Legnetti and DeSousa met with plaintiff in Delaware. Legnetti summarized plaintiff's failures to meet his probation objectives, and DeSousa gave him a letter of termination. Plaintiff asked for another chance and for more time to complete his assignments. He also raised the issue of his medical problems. DeSousa responded that plaintiff's doctor had cleared him to return to work without any limitations, and the company had no indication that plaintiff had a medical problem which prevented him from doing his job. Nevertheless, DeSousa told plaintiff if he produced medical documentation, Ciba might reconsider its termination decision.
On November 17, the day he was terminated, plaintiff wrote a letter to DeSousa claiming he had been "wrongfully terminated" by Ciba without consideration of the fact that his poor performance was "primarily caused by a series of medical problems that started in January of 1995, and further complications brought on by inappropriate treatment while under the care of a psychiatrist, for diagnosed Attention Deficit Disorder."
On November 20, 1995, plaintiff went to Dr. Vasquez's office with a three-page letter explaining that he had been terminated by Ciba for not meeting his performance objectives. He asked Dr. Vasquez to contact DeSousa about his treatment and the effect of his medication and illness on his ability to perform his job. In response to plaintiff's letter, Dr. Vasquez contacted Health Services on November 20 and informed them that plaintiff had not been attending the substance abuse meetings as *430 Dr. Vasquez had recommended. DeSousa never received any information, written or otherwise, from Dr. Vasquez or any other treating physician, regarding plaintiff's medical condition.
At trial, two psychiatrists testified as experts: Dr. Allwyn Levine for plaintiff and Dr. Morton Fridman for defendant. Dr. Levine testified that plaintiff "suffers from an Attention Deficit Disorder and co-morbid conditions of alcoholism and substance use disorder. He also has some of the other stigmata that are often seen in Attention Deficit Disorder, specifically, organizational difficulties, difficulties in planning. These have basically been lifelong difficulties." He did not explain, however, how plaintiff had managed academic and employment success until 1991 and again from 1992 to 1994. Dr. Levine testified that by August 1995 plaintiff was no longer suffering from a substance use disorder because he had stopped drinking in 1992. Dr. Levine did not mention plaintiff's admission that he began drinking again in 1994 and stopped in May 1995.
Defendant's expert, Dr. Fridman, opined that in 1995 plaintiff's "presentation was consistent with Attention Deficit Hyperactivity Disorder, a history of alcohol abuse, as well as depression and anxiety." Dr. Fridman considered plaintiff's abuse of prescription medications the "major problem" affecting his job performance in 1995. Plaintiff's ADD, on the other hand, was relatively mild and "affecting him minimally in '95." In Dr. Fridman's opinion, if plaintiff had not been abusing substances or experiencing family/personal problems in 1995, his performance would have been acceptable, as it had been in the past.
In addition to the two experts, one of plaintiff's succession of treating psychiatrists testified. Dr. Ricardo Fernandez began treating plaintiff in May 2000, almost five years after his termination. After plaintiff's first visit, Dr. Fernandez indicated that plaintiff "seemed" to have a history of ADD and gave plaintiff and his wife questionnaires from which the doctor concluded plaintiff did have ADD. Dr. Fernandez agreed that ADD is difficult to diagnose because its symptoms overlap with other psychiatric conditions and people with ADD often have multiple psychiatric disorders. Dr. Fernandez described ADD as follows:
Attention deficit disorder is a condition in which a person has an inability to maintain attention and focus on attention and is easily distracted from pursuing tasks that require attention. It usually is a lifelong disorder. It is often, but not always, associated with hyperactivity and impulsivity. These individuals can be impulsive, they can be irritable as well. There is very often a family history of attention deficit disorder ... as well.
In order to make the diagnosis you need to see disruption in two areas of functioning-social, academic or occupational.
At trial, plaintiff did not move for a directed verdict on the question of whether plaintiff was "handicapped" based upon both experts' agreeing he had ADD, he did not object to the jury charges, nor did he object to the jury verdict form. Indeed, plaintiff submitted proposed jury charges and a proposed jury verdict form presenting the jury with the question of whether plaintiff was handicapped.
The pertinent questions on the jury verdict form utilized at trial read as follows:
1. Has plaintiff Gregory J. Domurat proven by a preponderance of the evidence that he was handicapped between January and November, 1995?
Yes__ No___
If "Yes," answer the next question.
If "No," go to question No. 3.
*431 ....
3. Was plaintiff Gregory J. Domurat performing the essential functions of his job at a level that met defendant Ciba Specialty Chemical Corporation's legitimate expectations at the time of his termination?
Yes___ No___
The jurors answered "No" to questions 1 and 3.
After the verdict, plaintiff moved for a new trial, contending that "there was no question but that plaintiff was handicap[ped] according to the undisputed medical evidence in the case and under the standards." Plaintiff argued on the motion, as he does before us, that since the experts agreed on plaintiff's diagnosis, the court must determine as a matter of law that plaintiff was handicapped.
After hearing arguments on the motion for a new trial, the trial judge denied plaintiff's application on the ground that the jury was free to make its determination from the evidence as a whole, including the seventeen years plaintiff had successfully done his job at Ciba:
So clearly it was a fact question. There was no way this court could make that decision about whether there was a handicap....
Furthermore, the purpose of the whole ADA structure and LAD structure is to identify a handicap for the purpose of remediation, not that an employer must employ someone who chooses a) not to remediate and doesn't fulfill all facets of the job performance and doesn't meet the legitimate expectations of the employer and as charged here does not do the essential functions of the job.
So clearly this jury had it within its purview to say there is no handicap here because there was more than enough evidence to support that proposition.
Clearly, the doctors who treated plaintiff in 1995 never showed up. The jury is entitled to consider that and they did apparently. [The expert's] examinations occurred in the year 2000who knows what was going on with this man in 2000, but that's five years after the fact.
Plaintiff now appeals on the following grounds:
POINT I
PLAINTIFF PROVED HE WAS HANDICAPPED UNDER LAD WITH UNCONTROVERTED EXPERT MEDICAL TESTIMONY CONSISTENT WITH THE STATUTORY CRITERIA.
A. Handicap Under LAD
B. Medical Testimony Was Essential To Prove Handicap. The Court And The Jury Were Bound By Undisputed Expert Medical Testimony That Established That Plaintiff Was Handicapped
C. The Jury Should Not Have Decided Any Element Of Plaintiff's Prima Facie Case, Including Whether Plaintiff Was Handicapped
POINT II
PLAINTIFF PROVED HE WAS QUALIFIED TO DO HIS JOB
POINT III
THE TRIAL COURT ERRED IN ITS JURY CHARGE AND SPECIAL INTERROGATORIES NOS. 1 AND 3 REGARDING, RESPECTIVELY, PROOF OF HANDICAP AND PROOF THAT PLAINTIFF WAS QUALIFIED TO PERFORM HIS JOB UNDER LAD[.] THESE ERRORS ENTITLED PLAINTIFF TO A NEW TRIAL TO AVOID AN UNJUST RESULT
A. The Trial Court Asserted Several Times That Plaintiff's One and Only Hurdle Was To Prove Handicap
*432 B. The Trial Judge Misstated The Law To Prove Handicap During The Jury Charge And In The Court's Jury Verdict Form
C. The Trial Court Erred In Its Jury Charge And Special Jury Interrogatory No. 3 Regarding Proof That Plaintiff Was Qualified To Perform His Job Under LAD
D. The Trial Judge's Response To The Jury's Question
E. The Trial Judge's Disposition Of The Plaintiff's Motion For A New Trial Further Demonstrates The Trial Court's Error With Respect To Proof Of Handicap Under LAD
F. Plaintiff Is Entitled To A New Trial To Avoid An Unjust Result
1. Plaintiff Made His Position Known With Respect To The Legal Errors Made By The Trial Court
2. Plaintiff Is Entitled To A New Trial In The Interests of Justice

I
In Point I, plaintiff essentially argues that the jury's verdict was against the weight of the evidence. He contends that because the experts for both plaintiff and defendant agreed that plaintiff had ADD and other psychiatric disorders, the judge should have determined that he was handicapped as a matter of law and not submitted the question to the jury. We do not agree.
The burdens of proof and persuasion are well established for LAD cases:
New Jersey courts have traditionally sought guidance from the substantive and procedural standards established under federal law. Specifically, our courts have adopted the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to prove disparate treatment under LAD. Under that framework, a plaintiff must first prove a prima facie case of discrimination. To do so, a plaintiff must show that he or she (1) belongs to a protected class; (2) applied for or held a position for which he or she was objectively qualified; (3) was not hired or was terminated from that position; and that (4) the employer sought to, or did fill the position with a similarly-qualified person. The establishment of the prima facie case gives rise to a presumption of discrimination.
Once that threshold has been met, the burden of going forward shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. After the employer does so, the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext for discrimination. To prove pretext, however, a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent. Thus, under the McDonnell Douglas framework, a plaintiff retains the ultimate burden of persuasion at all times; only the burden of proof shifts.

[Viscik v. Fowler Equipment Company, 173 N.J. 1, 13-14, 800 A.2d 826 (2002) (citations omitted).]
The LAD is remedial social legislation. Our Supreme Court has stated repeatedly that it must be liberally construed. In Andersen v. Exxon Co., 89 N.J. 483, 495, 446 A.2d 486 (1982), our Supreme Court made it clear that the definition of "handicapped" is not limited to "severe" disabilities:
We reject such an interpretation of the New Jersey statute. We need not limit this remedial legislation to the halt, the *433 maimed or the blind. The law prohibits unlawful discrimination against those suffering from physical disability. As remedial legislation, the Law Against Discrimination should be construed "with that high degree of liberality which comports with the preeminent social significance of its purposes and objects."

[(Citation omitted).]
The issue squarely before us is whether the trial judge erred in denying plaintiff's motion for a new trial when the expert witnesses for both plaintiff and defendant agreed that plaintiff suffered from ADD and other psychiatric disorders. In other words, was the trial judge compelled to find that plaintiff was handicapped as a matter of law or was the jury free to make its own determination from the evidence as a whole, disregarding the experts' testimony.
We have little doubt that ADD and depression, like alcoholism and other psychiatric disorders, qualifies as a "handicap" under the LAD. Clowes v. Terminix International, Inc., 109 N.J. 575, 593, 538 A.2d 794 (1988); see also Enriquez v. West Jersey Health Systems, 342 N.J.Super. 501, 519, 777 A.2d 365 (App.Div.), certif. denied, 170 N.J. 211, 785 A.2d 439 (2001) (gender dysphoria qualifies as a "handicap" under the LAD); Tynan v. Vicinage 13 of the Superior Court, 351 N.J.Super. 385, 398, 798 A.2d 648 (2002) (post-traumatic stress disorder, depression, and anxiety panic attacks are psychological disorders that qualify as handicaps under the LAD); Fowler v. Borough of Westville, 97 F.Supp.2d 602, 615 (D.N.J.2000) (alcoholism and drug addiction qualify as handicaps under the LAD); Olson v. General Electric Astrospace, 966 F.Supp. 312, 316 (D.N.J.1997) (depression and other mental disorders are included in the definition of "handicapped" under the LAD).
In Clowes, supra, 109 N.J. at 597, 538 A.2d 794, and more recently in Viscik, supra, 173 N.J. at 1, 800 A.2d 826, our Supreme Court held that a plaintiff must present expert medical testimony to prove the existence of a handicap where it is not readily apparent. Nothing in those decisions, however, indicates that undisputed expert testimony removes the question from the province of the jury. Indeed, there is a consistent body of law to the contrary.
In Waterson v. General Motors Corp., 111 N.J. 238, 248, 544 A.2d 357 (1988), the Supreme Court held that "[a] jury has no duty to give controlling effect to any or all of the testimony provided by the parties' experts, even in the absence of evidence to the contrary." (Emphasis added). In Poliseno v. General Motors Corp., 328 N.J.Super. 41, 59, 744 A.2d 679 (App. Div.), certif. denied, 165 N.J. 138, 754 A.2d 1213 (2000), we held that where there is sufficient evidence in the record to the contrary, the jury need not accept the expert's testimony in whole or in part. In Ardis v. Reed, 86 N.J.Super. 323, 330, 206 A.2d 890 (App.Div.), aff'd o.b., 46 N.J. 1, 214 A.2d 313 (1965), we rejected plaintiff's argument that "`total disregard of the plaintiffs' medical testimony, the credibility of which stands unimpeached, is of itself ground for a new trial,'" where there was sufficient evidence in the record "to nullify plaintiffs' contentions." "Where [people] of reason and fairness may entertain differing views as to the truth of testimony, whether it be uncontradicted, uncontroverted or even undisputed, evidence of such a character is for the jury." Ferdinand v. Agricultural Ins. Co. of Watertown, N.Y., 22 N.J. 482, 494, 126 A.2d 323 (1956). In State v. Scelfo, 58 N.J.Super. 472, 477-78, 156 A.2d 714 (App.Div.1959), certif. denied, 31 N.J. 555, 158 A.2d 454 (1960), we held that "uncontradicted opinions *434 of ... highly qualified medical experts" were not dispositive on the issue of insanity because "such testimony is subject to the test of credibility in light of the attendant facts. Also, it is in parity with lay opinion testimony in that the jury is entitled to give each equal weight."
Here, the trial judge gave the model jury instruction on assessing the credibility of expert testimony and weighing it together with all other evidence. Notwithstanding the uncontroverted diagnosis of ADD, there was a substantial body of evidence from which the jury could conclude that plaintiff was not handicapped: (1) plaintiff was very successful academically, graduating summa cum laude from junior college and earning his bachelor's degree in the sciences; (2) he performed job responsibilities well, frequently exceeding his job requirements during his first seventeen years at Ciba; and (3) he was well liked among his co-workers and Ciba's clients. This evidence directly contradicted Dr. Fernandez's testimony describing ADD symptoms, diagnostic criteria, and life-time duration.
We hold that a trial judge is not compelled to find as a matter of law that a plaintiff is handicapped under the LAD solely because of uncontroverted medical evidence where there is sufficient evidence in the record to support a contrary finding by the jury.

II
Plaintiff next argues that he was "qualified to do his job." Clearly, the evidence demonstrates that during plaintiff's seventeen years of prior performance at Ciba he frequently exceeded his job requirements and that he was a "valued contributor" to the company in 1992, 1993 and 1994. Question 3, posed to the jury with plaintiff's consent, specifically asked:
Was plaintiff, Gregory J. Domurat, performing the essential functions of his job at a level that met defendant Ciba Specialty Chemical Corporation's legitimate expectations at the time of his termination?
The jury answered, "No."
Nothing in the LAD protects employees from termination if they are not performing the essential functions of the employer's legitimate expectations.
The Law does not prohibit discrimination against the handicapped where "the nature and extent of the handicap reasonably precludes the performance of the particular employment." N.J.S.A. 10:5-4.1; see also N.J.S.A. 10:5-2.1. (the Law does not "prevent the termination or change of the employment of any person who in the opinion of his employer, reasonably arrived at, is unable to perform adequately his duties.")
[Clowes, supra, 109 N.J. at 594, 538 A.2d 794.]
Moreover, an employer may terminate a handicapped employee where the handicap "in fact impedes job performance. There should be no second-guessing the employer." Andersen, supra, 89 N.J. at 496, 446 A.2d 486.
The evidence clearly demonstrated that at the time he was terminated, plaintiff was unable or unwilling to perform his job responsibilities. When he was returned to a full work schedule on August 25, 1995, there were no medical restrictions indicted by his own treating psychiatrist, Dr. Vasquez; he had rejected substance abuse treatment; he was given clearly delineated responsibilities during his probationary period; and he was granted extensions of time to complete his work. Nevertheless, his performance continued to deteriorate. The jury's finding that plaintiff was not performing the essential functions of his job at the time of *435 his termination was adequately supported by the evidence.

III
Plaintiff next argues that the trial court erred in its jury charge and jury interrogatories 1 and 3. Plaintiff did not object to the charge at trial, nor did he object to the verdict form, indicating that trial counsel perceived no prejudice would result. State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973). Failure to object to the charges requires plaintiff to make a showing of plain error on appeal. R. 1:7-2 and R. 2:10-2. To demonstrate plain error, plaintiff must show that the unobjected to jury charge and verdict form was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2.
The purpose of jury interrogatories is "to require the jury to specifically consider the essential issues of the case, to clarify the court's charge to the jury, and to clarify the meaning of the verdict and permit error to be localized." Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 419, 690 A.2d 575 (1997). Jury interrogatories "are not grounds for a reversal unless they were misleading, confusing or ambiguous." Id. at 418, 690 A.2d 575. Here, jury interrogatories 1 and 3 accurately reflected the elements plaintiff was required to prove and stated properly the time frames the jurors should consider in making their determination. Viscik, supra, 173 N.J. at 10, 800 A.2d 826.
When reviewing a claim of error in a jury charge, we must consider the charge as a whole to determine whether it "adequately convey[s] the law to the jury and do[es] not mislead or confuse." Zappasodi v. State, 335 N.J.Super. 83, 89, 761 A.2d 96 (App.Div.2000). Our scope of review is limited to whether the jury charge, as a whole, was capable of producing an unjust result. Ibid.
Plaintiff claims that the trial judge misstated the law and confused the jury by using the term "ADD symptoms" in the charge and "may have led the jury to conclude that plaintiff was not handicapped in 1995 unless his handicaps[,] which all the psychiatrists said plaintiff had all his life, manifested themselves to his employer, Ciba, in a special way in 1995." We find no merit in this argument. As we have indicated herein, the evidence supported the jury's conclusion that plaintiff was not handicapped in 1995 because it was contrary to the experts' repeated testimony that ADD was a lifelong disability that causes "disruption in two areas of functioningsocial, academic or occupational." The evidence adequately demonstrated that plaintiff functioned well in all three areas prior to 1991 and from 1992 to 1994.
Plaintiff further complains that the judge improperly instructed the jury that it could disregard the experts' testimony while instructing that they could find plaintiff handicapped by "competent legal evidence in the record to support a medical diagnosis." This charge is consistent with our holding that the jury may do precisely what they were instructed to do.

IV
Based upon our holdings herein, we find the remainder of plaintiff's arguments without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] In this appeal, plaintiff does not argue that he is handicapped by virtue of Lyme disease or that he was discriminated against on the basis of age.