**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0947-18T1

SUSAN CONFESSORE, as
ADMINISTRATRIX for the
ESTATE OF MICHAEL J.
CONFESSORE, deceased,
and SUSAN CONFESSORE,
individually,

      Plaintiffs-Appellants,

v.

AGCO CORPORATION,

      Defendant-Respondent,

and

WEMROCK ORCHARDS,
INC., and HIGHTS FARM
EQUIPMENT COMPANY,

      Defendants.

_____

Argued October 5, 2020 – Decided November 16, 2020

Before Judges Sabatino, Currier and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-0797-14.

Peter Chamas argued the cause for appellant (Gill & Chamas, LLC, attorneys; Jeffrey Zajac, Peter Chamas and William A. Bock, on the briefs).

Jacob Lehman argued the cause for respondent (German, Gallagher & Murtagh, attorneys; Jacob Lehman, on the brief).

PER CURIAM

This appeal arises from a jury's no-cause verdict in a products liability case.

Plaintiff's husband was killed in 2013 when a farm tractor he was operating at an orchard flipped over while attempting to remove a tree. The tractor was manufactured in 1975 by defendant's business predecessor in interest. Plaintiff and her experts claimed the tractor was defectively designed because it lacked a rollover protective system (a "ROPS"), which might have spared her husband's life.

In response, defendant and its experts contended the tractor was built in conformity with the industry's state of the art as of time of its sale in 1975. They maintained that a ROPS was not installed in 1975 for "low profile" tractors of the kind used in orchards, where low hanging branches could interfere with the elevated ROPS attachment. Defendant also argued that a "foldable" (or

2

"collapsible") ROPS, which plaintiff suggested as a design alternative, was not feasible in 1975, nor practical.

On appeal, plaintiff mainly challenges various aspects of the instructions provided to the jury on design defect principles. She also contends the verdict form was deficient, and that the judge made erroneous and prejudicial evidentiary rulings during the trial.

For the reasons that follow, we affirm.

I.

As of the time of this fatal accident in 2013, decedent Michael J. Confessore was a nighttime operations manager at AT&T. He lived with plaintiff Susan Confessore and their eighteen-year-old son.

Plaintiff and her husband were long-time friends of Lisa Giunco and Richard Giunco, a sister and brother who owned Wemrock Orchards (formerly known as Twin Lakes Orchard) in Freehold. The Giunco family owned the farm, a large portion of which was orchards, since around the 1950s.

Plaintiff worked part time at Wemrock. Decedent initially helped sometimes with school tours and hayrides at the farm. After Hurricane Sandy, decedent began to work part-time at Wemrock, removing trees from the orchard that had fallen in the storm.

A-0947-18T1

The Accident

Martin Becktel, who was working with decedent during the fatal incident, had been at Wemrock for about a year when the accident occurred. Becktel explained the tree removal process. Typically, Becktel would cut a tree and then hook it to the tractor by wrapping a chain around it. Then decedent would drive the tractor, pulling the tree off to the side. According to Becktel, sometimes a tree would be really "grown in, so [they] would have to rip it out."

On the day of the accident, May 17, 2013, decedent and Becktel were using the tractor for tree removal at Wemrock's property on Gravel Hill Road in Manalapan. While decedent was driving the tractor, a tree he was trying to remove would not budge any further. The tractor went up in the air a few times, and then flipped over, crushing decedent. It is undisputed he died from injuries caused by the accident.

The tractor decedent was operating was a Massey Ferguson ("MF") 255 model, which was manufactured in 1975. The tractor was sold to distributor Hights Farm Equipment Company ("Hights") and ultimately purchased by Wemrock in 1976 for use in the farm's orchards.[1] Edward Szczepanik, the owner

---

[1] Before trial, plaintiff settled with Hights and voluntarily dismissed her claims against Wemrock.

A-0947-18T1

of Hights, stated the tractor was "low profile," and was designed for use in orchards.[2]

Defendant AGCO Corporation purchased MF in 1994 and became its successor in interest. As the successor company, AGCO has assumed the manufacturer's liabilities and defenses for the tractors it sold.

Expert Testimony

Most of the testimony at trial centered on the parties' experts' differing opinions as to whether the tractor had a design defect.[3] We first summarize some of the main points the experts agreed upon or did not contest.[4]

The key and undisputed usefulness of a "low profile" tractor is its ability to work in areas, like orchards and barns, that have limited overhead space. While the opposing experts differed as to whether the tractor in this case should be classified as "low profile," they agreed that it was a MF model 255 that had certain "low profile" features. In particular, the experts agreed the tractor was less than sixty inches tall and had a horizontal exhaust. At the time, MF

---

[2] As we discuss, infra, the parties dispute whether the tractor was "low profile" or a "standard" model with custom-made "low profile" features.

[3] The parties also presented competing experts on economic loss, which are not germane to the liability issues on appeal.

[4] Neither party contests the qualifications of the opposing experts.

A-0947-18T1

produced three primary models: the 255, the 265, and the 275. All of those models came in either "standard utility," "low profile," or "row crop" configurations, depending on the purchaser's intended use.

The experts recognized that in 1975 the incidence of rollovers was a subject of concern in the tractor market. To discourage such accidents, tractors typically included warning labels about the dangers of rollovers and the hazards of "high hitching" (i.e., failing to attach a load to the tractor's drawbar when being pulled).

Plaintiff's Experts

### Kevin Sevart

Plaintiff's main liability expert was Kevin Sevart, a mechanical engineer. Sevart inspected the tractor involved in this accident and reviewed the witnesses' depositions.

Sevart testified it has been well recognized since the 1930s that agricultural tractors sometimes flip over. Sevart noted that both Szczepanik and Richard Giunco had specifically stated in their depositions that the tractor's intended use was in orchards. Even so, Sevart opined that the tractor was an MF 255 "standard utility" tractor with a horizontal exhaust and "low profile" features and not technically a "low profile" tractor.

A-0947-18T1

Sevart noted that the manufacturer had ultimately developed a ROPS for the MF 255 tractor. He opined a ROPS not only would have prevented the tractor from rolling onto decedent, but that one was technologically and economically feasible in 1975.

According to Sevart, the presence of a ROPS would not have eliminated the possibility of a rollover but would have reduced the harm to the operator. He maintained that the MF 255 without a ROPS was unreasonably dangerous and defective in design. He noted that by 1975, although not required, all United States manufacturers of tractors offered some form of optional ROPS that could be purchased for a nominal fee.

Sevart acknowledged that the federal Occupational Safety and Health Administration ("OSHA") requirements do not apply to a 1975 tractor. Even today, "low profile" tractors are exempt from having a ROPS. Sevart also agreed that it was not until 1985 that the American Society of Agricultural Engineering Standards required a ROPS on tractors for the first time.

Additionally, Sevart recognized that MF never sold a ROPS as standard equipment, and that a ROPS available in 1975 would have impeded, to some extent, the usefulness of a "low profile" tractor. Nonetheless, he asserted that MF could have produced a foldable version of a ROPS in 1975.

7

In this regard, Sevart asserted there were at least three safer tractor designs available at the time. For instance, as of 1966, manufacturers such as John Deere included standard forward-mounted fixed ROPS on tractors used in orchards in Europe. He also noted that a company in California had developed a limb-lifter ROPS for use in orchards in the early 1970s. Further, companies like Caterpillar (an industrial machinery company) had developed a folding system for bulldozers, which he referred to as a ROPS, with what Sevart claimed was a comparable technology needed for the MF 255.

Sevart specifically noted the possibility that an appropriate hinge, a key component in a folding ROPS, could have been developed at the time. Moreover, Sevart pointed out that by the 1990s MF offered its customers the opportunity to retrofit a ROPS for older model tractors.

Scott Batterman

Scott Batterman was plaintiff's expert in forensic engineering accident reconstruction and biomechanics. During his brief trial testimony, Batterman opined that the tractor's steering wheel crushed decedent's chest, and the failure to have a ROPS was a causal factor in the injury. This opinion on causation was not countered by the defense.

Defendant presented testimony from three experts who opined on design defect issues.

### David Murray

David Murray worked for AGCO as its director of product safety and standards. The court qualified him as an expert in agricultural mechanical engineering, product safety and design, safety and manufacturing standards, and accident investigation.

Contrary to Sevart, Murray opined that this particular MF 255 tractor was designed to be "low profile." He pointed to the tractor's wheels, which were smaller than usual, and its total height of less than sixty inches.

Murray noted that operators of tractors are supposed to be trained in the proper use of the equipment, and that OSHA requires yearly updates to that training. According to Murray, in order for this accident to have occurred, the tractor had to be pulling twice its capability. He explained that decedent had been dangerously "high hitching" the tree to the tractor.

As to the question of the use of foldable ROPS, Murray noted that such safety devices developed over time because the devices needed to be able to fold down in areas where overhead space was low.

Beginning in the 1980s, MF was developing a foldable ROPS for "low profile" tractors. After a change in regulations in the late 1980s, in 1993 MF began offering a foldable ROPS that could be installed on older models at a reduced price. There was little profit made in producing them because, according to Murray, most farmers were not interested in buying the ROPS for their older tractors.

Murray testified that while a hinge for a foldable ROPS may have been feasible in 1975, the foldable ROPS itself was not possible at the time because it required much more development. In addition, Murray asserted that Sevart's suggested alternative ROPS designs developed by other companies were not feasible and would not have prevented this injury. He noted that the limb lifter model was not a ROPS by its nature. And, the Caterpillar design was also not a folding ROPS, but instead a ROPS that could be collapsed to cover the steering wheel for transport, but such a feature made the ROPS impractical. Moreover, he claimed, in contrast to Sevart, that as of 1969 John Deere only offered a fixed ROPS in its parts book, which he doubted was even a ROPS based on its design.

Clyde Richard

Clyde Richard was defendant's expert in human factors, mechanical engineering, and accident reconstruction.

A-0947-18T1

To develop his expert opinions for this case, Richard used an exemplar tractor to do experiments with high hitching and low hitching.

Richard explained that a tractor cannot flip over rearward, if it is hitched properly, standing on level ground. According to Richard, the tractor in this case was being misused when the accident occurred. He further opined the tractor met the standards for a "low profile" model because of its wheels, exhaust system, overall height, and fenders.

Dennis Murphy

Dennis Murphy was defendant's expert in agricultural safety. Murphy agreed with the other defense experts that decedent and Becktel were using an improper hitching technique, instead of hitching to the drawbar, which caused the tractor to flip. He, too, opined this tractor was "low profile."

The Verdict

The trial judge presented an extensive jury charge explaining the legal concepts of design defect. As part of that charge the jurors were provided with a verdict form. The form contained a series of liability questions, culminating with a final question on damages. The first question, which addressed defendant's dispositive state-of-the-art defense, read:

> 1. Has the defendant Massey Ferguson, Inc. proven by
> a preponderance of the evidence that at the time the

11

tractor left its possession in 1975 there was no practical and technically feasible alternative design that would have prevented the plaintiff's injury without substantially impairing the reasonably anticipated or intended essential functions of the tractor?

_____ YES        _____ NO        Vote: _____


This verdict query tracked the recommended model form.  See Model Jury Charges (Civil), 5.40D-4, "Design Defect – Defenses" (approved Apr. 1999; rev. Oct. 2001).  The form and the judge's oral instructions told the jurors that if they answered this first question in the affirmative, they were to cease their deliberations.

On the second day of deliberations, the jury returned a unanimous 9-0 verdict, finding on Question #1 that defendant had met its burden of proof on the state-of-the-art defense.  Plaintiff did not move for a new trial.

The Issues on Appeal

This appeal ensued.  In her brief, plaintiff argues that: (1) the court erred in permitting defendant to present a state-of-the-art defense, and the jury should not have been charged on that defense; (2) the verdict form was deficient by not including a special factual interrogatory as to whether the tractor used by decedent was a "standard" or a "low profile" tractor; (3) the charge confusingly referred to principles of both "risk/utility" and "reasonably safer design"; (4) the

12

charge should have included an instruction on "crashworthiness" concepts; (5) the court erred in admitting evidence of negligence by decedent, Becktel, and their employer Wemrock; (6) evidence of defendant's post-sale actions was improperly presented; (7) the court erred in excluding evidence proffered by plaintiff of a 1966 forklift patent; and, finally, (8) cumulative error.

## II.

We first address plaintiff's various arguments that concern AGCO's successful state-of-the-art defense, as well as alleged flaws in the jury charge on liability.

## A.

The New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -11, provides:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.
>
> [N.J.S.A. 2A:58C-2 (emphasis added).]

The statute establishes in N.J.S.A. 2A:58C-3 an absolute defense to design defect liability, based on the "state-of-the-art" at the time the product was sold:

> a. In any product liability action against a manufacturer or seller for harm allegedly caused by a product that was designed in a defective manner, the manufacturer or seller shall not be liable if:
>
> (1) At the time the product left the control of the manufacturer, there was not a practical and technically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the product.
>
> [N.J.S.A. 2A:58C-3a(1) (emphasis added).]

As elaborated in the Supreme Court's seminal opinion on the defense, Cavanaugh v. Skil Corp., 164 N.J. 1, 4 (2000), the term "state-of-the-art" refers to "the very safest product of that type which [an] industry could define at the time of manufacture" or "a product for which [at the time] there was no reasonable alternative design."

A manufacturer that asserts a state-of-the-art defense has the burden to prove what was the existing design technology when the product was manufactured. Ibid. However, a plaintiff must show that such a reasonable alternative design was feasible at the time. Ibid.

As the Court in Cavanaugh explained:

> If a defendant can prove that there was no practical or technically feasible alternative design that both would

have prevented the harm and would not have substantially impaired the function of the product, the defendant cannot be held liable for failure to provide an alternative design.

[Id. at 6 (emphasis added; citations omitted) (quoting William A. Dreier, The Restatement (Third) of Torts: Products Liability and New Jersey Law—Not Quite Perfect Together, 50 Rutgers L. Rev. 2059, 2081-83 (1998)).]

The Court added:

The plaintiff . . . is usually required to show the existence of a reasonable alternative design. . . . Thus, a showing of feasibility is the plaintiff's responsibility.

[Ibid.]

For a manufacturer to prevail on the state-of-the-art defense, there must be an absence of "both a practical and technically feasible alternative." Id. at 9-10.

The state-of-the-art defense is not available if the danger can "feasibly be eliminated without impairing the usefulness of the product." N.J.S.A. 2A:58C-3a(2).[5] It is the plaintiff's burden to prove this exception exists. Roberts v. Rich Foods, Inc., 139 N.J. 365, 379 (1995) (citing N.J.S.A. 2A:58C-3a(2)).

---

[5] N.J.S.A. 2A:58C-3a(2) also provides an exception to the state-of-the-art defense, not applicable here if the product is workplace equipment.

As part of the state-of-the art functionality analysis, the product's inherent characteristics are relevant. "[A] feature of a product that is desirable but not necessary is not an inherent characteristic: an inherent characteristic must be an essential characteristic." Id. at 382. However, "[t]he elimination of an essential characteristic might not render the product totally useless, but it would measurably reduce the product's appropriateness for its central function." Ibid.[6]

Plaintiff argues the trial court erred in giving the state-of-the-art jury instruction because the tractor was standard utility and should have been sold with a fixed ROPS as mandatory, and not optional, equipment. According to plaintiff's theory on this point, a fixed ROPS was available as early as 1968 and, therefore, the lack of a fixed ROPS on a standard utility tractor was a design defect because it rendered this tractor unsafe as a matter of law.

Defendant does not dispute that it was selling a ROPS as optional equipment on its standard tractors as of 1975. Hence, defendant essentially conceded that if the tractor in this case was an unmodified standard tractor, the state-of-the-art defense could not justify the omission of a ROPS.

---

[6] In addition, the existence or absence of a warning is generally not relevant to the question of design defect. Saldana v. Michael Weinig, Inc., 337 N.J. Super. 35, 49 (App. Div. 2001) (citing N.J.S.A. 2A:58C-3). Although there was some testimony at trial about labels that at one time may have been affixed to this tractor, no failure-to-warn defect was asserted by plaintiff here.

Plaintiff's argument in this regard presupposes that the tractor was standard utility and not, in any sense, low profile. In fact, this premise was hotly contested at trial. All defense experts opined that the tractor was low profile or had been modified from standard for use as low profile. They supported this assertion by pointing to the tractor's lower height, smaller wheels, its exhaust system, and fenders. As we noted already, the defense experts further stated that a fixed ROPS would have interfered with the usefulness of a low profile tractor, by adding height to the vehicle and preventing its use in environments such as chicken coops, barns and orchards. Moreover, fact witnesses Richard Giunco and Szczepanik each stated that the tractor was low profile and intended for use in orchards.

Plaintiff points to several places in the record to support her claim that the tractor was not actually low profile. She quotes, for example, Murray's testimony that the tractor was a "standard tractor with low profile features," including shell fenders, low exhaust, low profile tires and a height below sixty inches. She further highlights a page from an MF brochure stating the MF 255 and MF 265 models all came "standard," with three-point linkage for mounted implements. Plaintiff also notes that Giunco owned other tractors, including an MF 245, which was a "low profile model."

A-0947-18T1

Having reviewed the record as a whole, we are satisfied there was ample evidence from which a jury could have reasonably concluded that the tractor was low profile, and, therefore, did not require a fixed ROPS. Among other things, Murphy, Murray, and Richards all testified the tractor was low profile either because of its wheels, exhaust system, fenders, height below sixty inches or a combination thereof.

Plaintiff does not dispute that at the time the tractor left defendant's control in 1975, a low profile tractor did not require a fixed ROPS. Given the reasonable factual support showing this was a low profile tractor, defendant appropriately asserted the state-of-the-art defense. Hence, the court was correct to deliver an instruction on state-of-the-art to the jury.

In a related point, plaintiff contends the trial court committed reversible error by declining to include a specific jury interrogatory on the verdict form, requiring them to determine whether (a) the tractor was standard or (b) low profile. We disagree.

Special interrogatories on verdict forms are utilized to prompt the jury "to specifically consider the essential issues of the case, to clarify the court's charge to the jury, and to clarify the meaning of the verdict and permit error to be localized." Sons of Thunders, Inc. v. Borden, Inc., 148 N.J. 396, 419 (1997)

18

(quoting Wenner v. McEldowney & Co., 102 N.J. Super. 13, 19 (App. Div. 1968)). Claimed flaws in verdict interrogatories are generally not grounds for reversal unless they are shown to be "misleading, confusing, or ambiguous." Id. at 418.

The trial court is reposed with substantial discretion in deciding whether to include a special interrogatory on a verdict form, and, if so, how to phrase it. See R. 4:39-2 (providing that the trial court "may submit to the jury, together with forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict.").

Here, the trial judge did not abuse her discretion in sustaining defendant's objection to plaintiff's requested query on the jury form. Plaintiff's binary question, asking whether the tractor was either standard or low profile, ignores the nuance and complexity involved in categorizing this particular tractor.

Several witnesses used qualifying language in describing or classifying this tractor. For example, defense expert Murray described the tractor as "a standard tractor" with "low profile features." Another defense expert, Richard, described the tractor as "a standard tractor made low profile," due to modifications.

A-0947-18T1

The classification of standard versus low profile defied a simple one-or-the-other jury inquiry. The jury could have found it impossible to answer such a binary question. No judicial discretion was misapplied in omitting the proposed query.

Plaintiff further argues that even if the tractor was low profile, a foldable ROPS was technically feasible and practical in 1975, and it was a design defect for defendant not to include some type of ROPS as mandatory equipment. Plaintiff contends this negates any reliance by defendant upon a state-of-the-art defense. We disagree.

To assert the state-of-the-art defense, defendant needed to show that at the point the tractor left MF's control in 1975, there was no practical or technically feasible alternative design that would have prevented decedent's injury. The evidence reasonably bore out that, in 1975, the state-of-the-art in the tractor industry was such that a foldable ROPS was not practical or technically feasible. Data had not yet been accumulated indicating a ROPS was necessary on a low profile tractor. Moreover, according to Murray's expert testimony, a folding ROPS that would be used sometimes and folded at other times presented significant risks that the tractor operator might forget to raise the ROPS after leaving the low profile area.

A-0947-18T1

Plaintiff argues the court erred in giving the state-of-the-art instruction because defendant allegedly challenged only the practicality, and not the technical feasibility, of including a folding ROPS in 1975. She spotlights several portions of the record to support her claim.

For example, defense expert Richard testified that a foldable ROPS was technically feasible in 1975, but it just had not been done yet. But Richard then elaborated, "[w]hat happens in engineering is there's an accumulation of data, and there's some accumulation of data . . . then different things pop up. But there hadn't been, at that point, I believe, an accumulation of data in the early '70s." Richard also testified that a foldable ROPS in 1975 was not feasible because it had not been engineered, proof tested, or field tested "to make sure it wouldn't create accidents." In essence, Richard's opinion was that the state-of-the-art in 1975 was such that the technical data had not yet indicated the need for a folding ROPS on a low profile tractor and, therefore, one had not yet been designed.

Plaintiff also points to Murray's testimony that it would have been feasible but not practical to design a folding ROPS in 1975. But Murray also testified that low profile tractors were a "relatively small part of the market," and "it took time to get the statistics" to determine the actual risk of having a low profile

21

tractor where the driver might forget to put the ROPS back up when no longer in a low profile situation. When asked whether in 1975 it was feasible to have a hinge that connected a ROPS to a low profile tractor, Murray responded, "[t]here's a lot more involved than just a hinge."

Murray did ultimately acknowledge that it would have been feasible in the 1970s to do the necessary studies, but a foldable ROPS presented other serious risks for operators of low profile tractors. He noted that, even currently, OSHA regulations specifically state that a foldable ROPS on a low profile tractor is not feasible.

Murray testified that, although the component of a hinge was feasible in 1975, a foldable ROPS "was not feasible at that time." Murray explained that there was not yet a basis to ensure that such a hinge "was strong enough to meet the qualifications of a ROPS at that point in time."

Murphy similarly testified that standards for such a device "hadn't even been invented yet." He further noted that an OSHA Committee considered, and apparently agreed with, testimony during the rulemaking process that it was "not feasible" to require a ROPS on tractors used in low profile situations.

A-0947-18T1

Lastly, Richard testified that a folding ROPS had not been designed or "proof tested" for safety and was not "technically feasible and practical back in 1975."

Plaintiff contends that Murray and Richard "admitted" technological feasibility by acknowledging the feasibility of a hinge component. However, a jury reasonably could have found persuasive Murray's caveat that it was not yet technologically clear in 1975 that such a hinge would have met the strength requirements for a foldable ROPS. She also points to testimony Richard gave at his pretrial deposition agreeing that a foldable ROPS could have been built in 1975. But when confronted about that earlier statement on cross-examination at trial, Richard explained the reason one had not yet been built as of 1975 was because "there were too many unknowns."

Despite the attempted impeachment of these two witnesses by plaintiff's skillful advocacy, the jury could have reasonably accepted their explanations, along with Murphy's own testimony and the lack of OSHA approval, and concluded a foldable ROPS was not yet technologically feasible when this tractor was manufactured. The record simply is not as one-sided as plaintiff portrays it.

23

Plaintiff cites <u>Barker v. Deere & Co.</u>, 60 F.3d 158, 166-67 (3d Cir. 1995), for the proposition that the nonexistence of a safety device is not evidence of its non-feasibility. That case is readily distinguished because it specifically analyzed Pennsylvania law, and not whether a jury should be instructed on New Jersey's state-of-the-art defense. Also, as we have noted, several experts opined that there were risks associated with a foldable ROPS, inasmuch as a tractor operator might forget to raise it when leaving a "low profile" area. No data existed in the 1970s establishing that the risks of such a foldable ROPS outweighed the benefits.

Viewing the record as a whole, there was substantial evidence presented that it was not practical or technically feasible to design the folding ROPS in 1975, given that the data had not yet indicated the need for it. The jury was appropriately asked to resolve whether these proofs supported defendant's position. The court was correct to give the state-of-the-art instruction.

Once defendant asserted the defense, it became plaintiff's burden to establish that there was a superior design available that would not impair the usefulness of the tractor. It was for the jury to decide whether defendant correctly asserted the defense and whether plaintiff met her burden of proof. The jury concluded on Question #1 that the defense had been established.

A-0947-18T1

When determining on appeal whether jury instructions were erroneous, the question is whether the charge was clearly capable of producing an unjust result. Domurat v. Ciba Specialty Chems. Corp., 353 N.J. Super. 74, 93 (App. Div. 2002). A reviewing court must consider the instructions as a whole to determine whether they adequately conveyed the law and did not mislead or confuse the jury. Ibid. Instructions given in accordance with the model charge, or which closely track the model charge, are generally not considered erroneous. Mogull v. CB Commercial Real Estate Grp., Inc., 162 N.J. 449, 466 (2000).

To summarize, the trial court did not err in allowing defendant to present a state-of-the-art defense at trial, and in so instructing the jury on that defense. The court's instructions and verdict form on state-of-the-art closely tracked the model jury charge for the state-of-the-art defense. The instructions and verdict form were not capable of producing an unjust result or prejudicing substantial rights. R. 2:10-2.

The evidence reasonably supported a jury finding that the tractor was low profile, and therefore there was no practical or technically feasible ROPS available when the tractor left defendant's control in 1975.

B.

Plaintiff argues the court erred in giving the jury instructions on both "risk utility" and "reasonably safer design" concepts. At trial, there was extensive discussion between counsel and the judge as to whether the court should give the model instructions on both risk utility and reasonably safer design. The court agreed that the overlap in the two charges could be confusing, but nevertheless, decided to give both charges.

Specifically, the court instructed the jury that: a defendant must design a product that is reasonably safe; a design defect exists if the foreseeable risk of harm could have been reduced or avoided by adoption of a reasonably safer design; and, that if defendant failed to include a practical and technically feasible safer alternative design, the tractor had a design defect. However, if plaintiff failed to provide a practical and technically feasible safer design, or if the tractor was designed reasonably safe, then there was no design defect.

Additionally, the court instructed the jury to weigh the "risk utility" factors, which are: (1) the usefulness and benefit of the tractor as it was designed; (2) safety aspects of the tractor; (3) if there was a substitute design that was feasible and practical; (4) the ability of defendant to eliminate the unsafe character of the tractor without impairing its usefulness; (5) the ability

26

of a foreseeable user to avoid danger by the exercise of care; and, (6) the awareness of the user of dangers because of general public knowledge or the existence of warnings or instructions.

Plaintiff contends the court should have given only the "reasonably safe design" jury charge and omitted any "risk utility" charge. In fact, the product liability statute and case law in design defect matters meld these two concepts, to some extent.

The delineation of an actionable "design defect" under N.J.S.A. 2A:58C-3a(1) includes a consideration of both: (1) whether there existed "a practical and technically feasible alternative design that would have prevented the harm" — which concerns the availability of reasonably safer alternative designs; and, (2) whether that design "would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the product" — which involves an evaluation of the utility of the product. Ibid.

The statute entails weighing the risks of not adopting the alternative design against the utility of that design change and its impact upon the product's functionality. As the Supreme Court has explained:

> The decision whether a product is defective because it is "not reasonably fit, suitable and safe" for its intended purposes reflects a policy judgment under a risk-utility analysis. . . . That analysis seeks to determine whether

a particular product <u>creates a risk of harm that outweighs its usefulness</u>. . . . Risk-utility analysis is especially appropriate when a product may function satisfactorily under one set of circumstances and yet, because of a possible design defect, present an unreasonable risk of injury to the user in other situations. . . .

[<u>Jurado v. W. Gear Works</u>, 131 N.J. 375, 385-86 (1993) (emphasis added) (citations omitted).]

We recognize the Notes to the Model Jury Charges advise that in a design defect case, generally the court should provide the jury with either the charge on "reasonably safe design" or "risk utility," but not both. <u>See</u> <u>Model Jury Charges (Civil)</u>, 5.40D-3, "Design Defect – Legal Tests of Product Defect" (approved Apr. 1999). The Notes advise that either charge can be appropriate because they essentially focus on the same principles. <u>Ibid.</u> However, the Notes go on to say the trial court may issue the reasonably safer charge but may <u>also</u> "use the additional risk-utility factors only if the case is unusual in that it requires one or more of these additional elements." <u>Ibid.</u>

Although it may have sufficed here for the court to have issued only the "reasonably safer" charge and omitted the "risk utility" charge, the overlap or redundancy of those charges in this case was not unduly prejudicial. The overlap does not provide grounds for setting aside this verdict.

The experts on both sides debated whether a foldable ROPS was an available "reasonably safer" design that could reduce the risks of rollovers. In addition, they also debated whether such a safer device significantly reduced the utility of a tractor used in low profile settings because such a device needed to be raised and lowered by the operator. Both risk and utility were part-and-parcel of the contested issues.

The additional concepts the court mentioned in the "risk utility" instruction were not demonstratively prejudicial to plaintiff. Moreover, any alleged prejudice to plaintiff arising out of overlapping charges is conjectural. That is because the jury never reached this defect issue, having concluded on Question #1 of the verdict form that the state-of-the-art defense foreclosed liability, regardless of the comparative risks and benefits of an alternative design that the jury found simply did not exist in 1975. In sum, the overlap of the instructions was not of consequence here.

## C.

Plaintiff further criticizes the jury charge for not containing an instruction on the concept of "crashworthiness."

"'Crashworthiness' is defined as the ability of a motor vehicle to protect its passengers from enhanced injuries after a collision." Poliseno v. Gen. Motors

A-0947-18T1

Corp., 328 N.J. Super. 41, 51 (App. Div. 2000) (citation omitted). "Strict liability is imposed on a manufacturer for injuries sustained in an accident involving a design or manufacturing defect that enhanced the injuries, but did not cause the accident." Id. at 52.

Here, it is undisputed that a ROPS would not have prevented the rollover accident itself. Rather, plaintiff claims that a ROPS, whether standard or foldable, would have lessened the impact upon her husband once the rollover occurred.

We are mindful of the Restatement (Third) of Torts: Products Liability § 16 (Am. Law Inst. 1998) (Restatement), which explains the concept of crashworthiness in a manner that arguably could fit this kind of tractor rollover case. Under such a concept, "[t]he plaintiff must . . . establish that the defect [in lacking a design that is 'crashworthy'] was a substantial factor in increasing the plaintiff's harm beyond, the harm that would have occurred from other causes." Ibid. Indeed, the Restatement presents a scenario that depicts a situation with a tractor rollover accident occurring when a tractor lacked a ROPS. Id. at cmt. b, illus. 4.

Despite these Restatement passages, our Supreme Court has yet to prescribe that a jury charge on crashworthiness is appropriate to use in a

products liability case that involves a tractor, rather than an automobile or a truck. In the absence of such a mandate, the trial judge did not err in denying plaintiff's novel request for the charge in this tractor setting.

Moreover, the detailed charges which the court did issue on design defect principles furnished the jurors with helpful guidance in considering the possible benefits of having a ROPS installed to prevent the decedent from sustaining greater harm in a rollover.

Lastly, the absence of a crashworthiness charge is inconsequential because the jurors found the state-of-the-art defense was applicable and did not reach the issue of damages.

### III.

The remaining arguments posed by plaintiff are likewise unavailing. We briefly canvass them here. All of them concern rulings of evidential relevance and admissibility, as to which civil judges generally have wide discretion. See, e.g., Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999).

First, we are unpersuaded the court abused its discretion in admitting certain proofs of negligent conduct on the part of decedent, Becktel, and Wemrock. Their conduct was germane to the issues of proximate causation. For example, if the jury found the accident could have been avoided if the chain

A-0947-18T1

attached to the tree had not been "high-hitched," such a finding would weigh against a finding that an alleged design defect in the tractor proximately caused the harm. See Fabian v. Minster Mach. Co., Inc., 258 N.J. Super. 261, 278 (App. Div. 1992).

Next, the court did not abuse its discretion in admitting proof of defendant's post-sale actions in marketing a folding ROPS in 1993. That evidence was admissible under N.J.R.E. 401 because it was relevant to defense expert Murray's general discussion about the evolution of the ROPS from the 1960s through the present time. The court also gave a limiting instruction that reasonably explained to the jury the limited probative nature of this post-sale evidence.

Plaintiff further argues the court erred in admitting evidence of the OSHA standard regarding low profile tractors, because the standard was adopted in 1976, after the tractor was manufactured. The court ruled that the OSHA standard could be discussed in opening and closing statements and the court would instruct the jury that opening and closing statements are not evidence. The court also ruled the parties could bring out in testimony the fact that OSHA standards for ROPS were adopted after 1975. In making these rulings, the court did not abuse its discretion.

A-0947-18T1

The timing of the evolution of the OSHA standards provided the jurors with useful context. Moreover, at least one expert pointed out OSHA has not required foldable ROPS to be installed on low profile tractors, even to this day. The evidence had sufficient probative value under N.J.R.E. 401 to be presented and was not so substantially prejudicial as to require its exclusion under N.J.R.E. 403.

Plaintiff further argues the court erred in permitting defendant to introduce evidence of the manufacturer's 1993 marketing campaign. The court's instructions clearly asked the jury to determine whether there was a design defect according to the state-of-the-art in 1975. Even if every aspect of the post-1975 marketing campaign was not entirely relevant, it was appropriate for the jury to understand the evolution of the ROPS, as part of its assessment of whether there was a reasonable safer design alternative available in 1975.

As a final claim of evidential error, plaintiff argues the court erred by disallowing her to introduce evidence of a 1966 patent for a retractable overhead guard for a forklift. The court excluded the forklift patent because it was not designed to prevent a tractor rollover. We detect no abuse of discretion under N.J.R.E. 403 in the court's exclusion of this attenuated proof concerning a different product.

Plaintiff's claim of cumulative error and all other points raised on appeal, to the extent we have not already addressed them, lack sufficient merit to be discussed here.  <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0947-18T1